TINNIE NEWLIN, for Herself, and as Trustee for
EARL and RUBY NEWLIN, v. ST. LOUIS &
SAN FRANCISCO RAILROAD COMPANY,
Appellant.

Division One, July 12, 1909.

1. **COMITY: Laws of Another State.** In determining plaintiff's
right to a cause of action under the statutes of another state,
it must be held that where there is no cause under the
*lex loci* there is none here. Those statutes will not be ad-
ministered here any more or less blandly than they are by
the courts of the sister state.

2. ———: ———: **Blocking Switches.** Missouri has statutes re-
quiring switches to be blocked, but Kansas has not; and where
plaintiff's cause of action is based upon the failure of defend-
ant railroad to block its switches in Kansas, the Missouri
statutes are of no avail to plaintiff.

3. **NEGLIGENCE: Pleading: Proof.** Where negligence is spec-
ified in a petition as a cause of action, the specifications must
be substantially proved as pleaded, or some one of the sev-
eral specifications constitutive of the cause must be proved as
alleged, or there can be no recovery.

4. ———: ———: **Blocking Switch: Responsive Proof.** Where
plaintiff pleaded (1) that a specific split switch on the scale
track in the Kansas yards, in which the deceased switchman's
foot caught, had been once blocked; (2) that the blocking
had been allowed to decay and become rotten and so dis-
appear; and (3) that defendant railroad company had suffi-
cient notice of such decay, rotten condition and disappear-
ance as required it in law to repair, there being no Kansas
statute requiring switches to be blocked, plaintiff must prove
said three specifications in order to recover. And though
there is sufficient testimony that the particular switch was
once blocked to take the case to the jury on that specification,
yet there being no testimony tending to prove that said block-
ing became rotten and decayed, or that defendant had either
actual or imputed knowledge of that fact, a verdict for plain-
tiff in the face of a demurrer, cannot stand and the judgment
must be reversed.

Appeal from Jackson Circuit Court.—*Hon. H. L. Mc-Cune,* Judge.

REVERSED.

*W. F. Evans, Dana, Cowherd & Ingraham* and *Hunt C. Moore* for appellant.

(1) The objection to the introduction of any evidence under the petition should have been sustained. (a) It failed to state either in so many words or facts showing that deceased would have had a cause of action against appellant had he lived. This point was duly raised by special demurrer. Lee v. Railroad, 195 Mo. 415. (b) Plaintiff lived in Kansas; the injury occurred in Kansas. If there is any cause of action, it is solely by virtue of the statute law of that State. No cause of action accrued to plaintiff under the common law. Whether or not there is a cause of action depends wholly upon the laws of Kansas. Root v. Railroad, 195 Mo. 345; Railroad v. Hurd, 56 L. R. A. 193; McGinnis v. Missouri Car Co., 174 Mo. 225. It would be a strange "comity" that would enforce a part of a statute and in so doing violate another part of it. (c) The Legislature of Kansas has further required that notice to defendant must be given before filing the suit. The petition contains no statement as to this. This court has held this averment a jurisdictional prerequisite. Mathieson v. Railroad, 219 Mo. 542. (2) The demurrer to the evidence should have been sustained. The evidence showed no negligence of appellant. In view of the fact that the petition contains but one single charge of negligence, it is perhaps unnecessary to call the court's attention to the following undisputed facts: 1. There is no law of Kansas (statute or decision) making it the duty of appellant to block its switch tracks. 2. The automatic coupling was of the latest kind and of the character

required by the act of Congress. 3. Plaintiffs made
no charge in their petition that this device was in any
way out of order. 4. There is no complaint that ap-
pellant's engineer, fireman, switching crew or foreman
were not careful or that they were not at their proper
places at the time of the accident. 5. The train was
being moved carefully. 6. There was no arraignment
of appellant by the petition on the ground that it had
or had not, as a general proposition, adopted the
"blocking system" in its yard. Under the law of
Kansas, he would have stated no cause of action by
simply alleging that defendant had not blocked the
switch at any time. Rush v. Railroad, 36 Kan. 129;
Gilbert v. Railroad, 128 Fed. 529. Plaintiffs planted
their case upon the sole and specific charge that de-
fendant had blocked this particular switch, then neg-
ligently allowed the blocking to become "rotten, de-
fective, and worn out, and had wholly disappeared."
In other words, this allegation means that defend-
ant had put blocking into this switch, and had allowed
it to become rotten, decayed, and had failed to repair
it. It did not mean that the act of negligence charged
was that defendant had never at any time blocked this
switch. Therefore, having stated this cause of action
a plaintiff must recover, if at all, upon that cause and
not upon another. Brown v. Railroad, 59 Kan. 70;
Telle v. Railroad, 50 Kan. 455.

*John M. Cleary* for respondents.

(1) The petition stated a cause of action. Lee v.
Railroad, 195 Mo. 415; Grace v. Nesbit, 109 Mo. 9;
Hughes v. Carson, 90 Mo. 399; Garth v. Caldwell, 72
Mo. 629; Wagner v. Railroad, 97 Mo. 520; Henry v.
Sneed, 99 Mo. 407; Allen v. Choteau, 102 Mo. 318;
Beckman v. Insurance Co., 49 Mo. App. 604; Powell
v. Sherwood, 162 Mo. 605; Bank v. Pettit, 85 Mo. App.
499; Worthley, Admr., v. Hammond, 76 Ky. 510; Fiebel-

man v. Fire Assurance Co., 108 Ala. 180; Elliott v. Stuart, 15 Maine 160; Schenck v. Insurance Co., 71 Cal. 28; Bentley v. Bustard, 35 Ky. 643; Wallace v. Curtis, 36 Ill. 156; Railroad v. Shieman, 96 Ky. 507. (2) The demurrer to the evidence was properly overruled. Pauck v. Beef Co., 159 Mo. 475; Lee v. Railroad, 195 Mo. 429; Huhn v. Railroad, 92 Mo. 449; Hamilton v. Mining Co., 108 Mo. 373; Emporia v. Kowalski, 66 Kan. 64; O'Neill v. Railroad, 62 Neb. 358; Sherman v. Railroad, 34 Minn. 259; Spaulding v. Railroad, 89 Iowa 217; Waldier v. Railroad, 87 Mo. 37; Devlin v. Railroad, 87 Mo. 550; Railroad v. Sanders, 166 Ill. 280; Bradshaw v. Railroad, 58 Kan. 618; Brinkmeier v. Railroad, 77 Pac. 586; Nelson Vit. Brick Co. v. Musselman, 99 Pac. 238; McManus v. Oregon Short Line, 118 Mo. App. 161; Railroad v. Eversole, 69 Pac. 1126; Railroad v. Irwin, 37 Kan. 701; Railroad v. Swarts, 58 Kan. 235; Rouse v. Ledbetter, 56 Kan. 348; Charlton v. Railroad, 200 Mo. 413. (3) The demurrer at the close of the whole case was properly overruled. Brady v. Railroad, 206 Mo. 508.

LAMM, P. J.—Leroy Newlin was the husband of Tinnie Newlin on August 15, 1905, and for eight months had been in defendant's employ as a switchman in its yards in Rosedale, Kansas. Earl and Ruby are minors and the only children born of the marriage. Leroy was killed while in the line of duty switching in said yards in trying to uncouple two moving freight cars—his foot being caught and held in an unblocked space between the main rail and a switchrail.

The widow sued in Jackson county, Missouri, charging negligence as follows:

"The death of said Leroy Newlin was directly occasioned by wrongful acts and omissions on the part of defendant, its servants, agents and officers, in that the blocking in its tracks, between the main rail and

the switchrail at the place aforesaid, had become rotten, defective and worn out and had wholly disappeared and defendant failed, omitted and neglected to block or fill said interval and repair said defect so that there was no protection against the entrapping of a foot in the space between said main rail and said switchrail.

"That at the said time defendant knew or by the exercise of ordinary care might have known that said blocking or filling had decayed, rotted out and had entirely disappeared and that there was at said time no blocking or filling in said interval between said main rail and switchrail and that there was no protection at said place against the entrapping of a foot therein but utterly failed, neglected and refused to repair or replace said blocking or filling and permitted the same to remain in said defective and dangerous condition, but said Leroy Newlin was wholly ignorant thereof."

The right of plaintiffs to recover for the wrongful death of Leroy Newlin arises on two Kansas statutes, *viz.*: Section 4871, paragraph 422, and section 4872, paragraph 422a, of article 18, chapter 80, of the General Statutes of Kansas, 1901. These are the same statutes on which plaintiffs relied in Lee v. Railroad, 195 Mo. l. c. 419, and Charlton v. Railroad, 200 Mo. l. c. 419, and are found there in full (q. v.). They will not be reproduced unless in the evolution of the case such course becomes necessary.

Defendant answered in, *first*, a general denial; *second*, a plea of contributory negligence of decedent; *third*, an allegation that if decedent was injured by the negligence of any one other than himself, it was that of persons who were fellow-servants under the laws of the State of Kansas and such risk was assumed; *fourth*, that under the laws of the State of Kansas (chap. 341, Laws of Kan. 1905), defendant was entitled to a notice in writing from plaintiff within eight months after the injury, stating the time and

place thereof, and that no such notice had been given (the statute is pleaded but need not be set forth here); *fifth,* for a further defense defendant pleaded a general assumption of risk; and, *sixth,* for still another, alleged that defendant's liability, if any, depended upon and is to be determined by the law in force at the time in Kansas and, under such law, defendant is not liable.

Plaintiffs replied as follows:

"Now comes plaintiffs and for reply to defendant's amended answer herein deny each and every allegation in said amended answer contained.

"For further reply to defendant's amended answer herein plaintiffs state that chapter 341 of the Laws of Kansas of 1905, is not fully set forth in defendant's amended answer; that said chapter is not applicable to this cause or to the facts as set forth in the petition herein and does not read as alleged in the amended answer; that said chapter has no force or effect in this action or in this State and is amendatory of the Coemployees' Law of the State of Kansas and the right of action in the plaintiffs herein is not governed by said act; that in any event, the plaintiffs in this action have fully complied with said chapter, wherefore," etc.

From a judgment entered on a verdict in favor of plaintiffs for $5,000, defendant appeals.

A group of questions are briefed and argued. For example:

Whether the statute pleaded in the 4th paragraph of the answer and in the reply relates to liability under the fellow-servant law of Kansas, alone, or covers the case stated in the petition for negligence of the master in not providing a reasonably safe field of operations.

Again, defendant, to show non-liability, introduced sections of the Kansas code of civil procedure prescribing in what counties venue should be laid and

where suits should be brought against railway corporations for personal injuries, and counsel argue these statutes are part of the substantive law and, hence, this suit was brought in Missouri in violation of those statutes. *Contra,* plaintiff's counsel argues that those statutes have no extra-territorial force or effect, that they cover mere adjective law and relate solely to procedure in suits in the State of Kansas—not elsewhere; and if construed otherwise would strike down a settled legislative policy of comity.

Again, certain paper rules of defendant were put in evidence and it was shown that decedent received them on entering its employ and contracted to observe them. These rules recognize and remark upon the dangers incident to switching and especially in uncoupling cars. One of them provides that switchmen "must be particular to notice the speed of the cars while moving, and *if at a dangerous rate* no attempt must be made to couple by going between them." It then (in a somewhat double way) goes on to state that it is dangerous to uncouple or to attempt to place links, pins or knuckles while cars are in motion, "and *is positively forbidden.*" To avoid this rule plaintiffs rely upon a proved custom or usage in the Rosedale yards, long in vogue, whereby when trains were proceeding at slow speed (as was this) and when the lift-rod of an automatic car-coupler would not work the pin (as did this) a switchman under the eye of his foreman and following his example went between the cars to pull the pin by hand precisely as decedent did. Testimony tending to show such custom was objected to, error is assigned in its admission and that question is here.

Again, errors are assigned on instructions.

But until it be first determined that plaintiffs were entitled to go to the jury on the case made, that is, that they put in evidence tending to prove

the specific negligence alleged, we need not consider them.

Error is assigned in that behalf in that an instruction should have been given in the nature of a demurrer directing a verdict for defendant. Defendant saved an exception to the refusal of such demurrer. To that assignment we pass *in limine*.

There is no dispute about salient facts. The statutes of Kansas, pleaded in the petition, answer and reply, were put in evidence. On the 15th day of August, 1905, Leroy Newlin, a good husband in good health, then twenty-eight years of age, was, with three other switchmen under one Flanagan as foreman, switching in defendant's yards in Rosedale, a little west of the State line. During the afternoon of that day one of defendant's engines run by Dean, engineer, was pushing north five loaded freight cars, head on, for the purpose of switching three of them on another track. It was Newlin's duty to cut off the three north cars by uncoupling them from the two south ones. The switch in hand is known as "a split switch." While the train was moving, at about four miles per hour, in the performance of duty he signaled Dean to "kick" the cars when the switch was reached. He then seized a grab-iron on the third car from the engine, an appliance put on the end of the cars for use in uncoupling them and intended to steady and support the switchman in his work, and, moving with the train, tried to manipulate the lift-rod on the north end of the second car from the engine to pull the coupling pin. The gearing of this lift-rod was stiff and out of order. Failing to uncouple the car by use of that automatic appliance, and the lift-rod of the third car being on the other side of the train, he went in between the cars, and in trying to pull the pin by hand his left heel caught in the split switch and he was thrown down and so crushed by a car wheel that he presently died.

For present purposes we will omit all of the evidence pertinent to assignment of errors on custom, notice, contributory negligence, assumption of risk and to exceptions saved, and confine this statement to the testimony on the specific charge of negligence on which liability is predicated.

Plaintiffs put Flanagan on the stand. He had been foreman in the yards for the rise of four years before the accident and testified that he at no time noticed any blocking in that switch, that to his knowledge he never observed any decayed pieces of lumber in the switch and never looked for that; he never observed and could not say whether any of the switch points, frogs and yard rails of that yard were blocked. At a certain time (ten days after Newlin's death), counsel for plaintiffs was on the ground and caused some photographs to be taken. He then met Flanagan and the latter showed him the split switch. On being inquired of, he testified there was no blocking at all in that switch at that time to his knowledge. Shown a photograph, he testified it didn't represent any blocking, and reiterated his testimony that at the time he did not see any and did not look for any.

On cross-examination he reiterated his testimony in chief that if there was any blocking in that switch he never saw it and had no recollection of seeing any in the yards.

On redirect examination, asked this question: "Do you remember on the day I was down there and taking these photographs of my calling your attention to some pieces of decayed wood still spiked to the ties on this frog?" he replied: "Yes, sir, you called my attention to it." Further along he testified that the word "frog" does not apply to a split switch.

Mays, of the switch crew, put on by plaintiff, was asked whether he noticed any blocking in the switch out of which he took defendant's shoe. His reply was: "No, there was no blocking in that place."

Asked if he noticed any blocking "around there," he answered: "Well, there was some blocking around there but I couldn't state exactly what tracks were blocked." Pressed on the blocking in the switch, he again asserted he did not observe any and added he did not look for any. Again inquired of generally if any of the frogs, guard-rails or switches were blocked in the Frisco yards in Rosedale, he answered: "Some were." He estimated that 25 or 30 per cent of them were blocked. It seems he had worked in those yards for 20 days, *viz.*, between August 10th and 30th, 1905.

On cross-examination his knowledge was sifted on blocking in the yards and he could name no particular switch that was blocked, although the switch in question was known as the "scale track switch" and some other switches had names. He was "pretty sure" there was a block in the switch on the other side of the scale switch and another one he thought had blocking. Asked if he did not know there was no block in the scale switch at the time and no sign of one, he replied: "Well, there is a few nails in there but no sign of a block in there." He was then confronted with his deposition taken by plaintiffs shortly after Newlin's death in which he testified that the switch was not blocked. He admitted so testifying and said it was correct. In that deposition he was asked this question: "Was there any evidence of its ever having been blocked before?" He answered he did not notice it, that it could have been blocked and he not notice it, and then added: "but at the same time there was nothing there that made it look as if it ever had been blocked." He admitted saying that, but now qualified it by saying that he overlooked "this rubbish," referring to the nails, but that there was "no wood or blocking."

The step-father of Mrs. Newlin, Mr. Melton, testified he went to the yards on the 25th of August,

(ten days after the accident); that Flanagan pointed out the place Newlin was killed; that he examined that switch at that time. The record shows as follows: "A. Well, there was some blocking there where they said his foot was caught. . . .

"Q. Just state what was in that switch when you came there? A. Well, there was some pieces of wood—splintered wood, I would think about fourteen or sixteen inches long, and two or more boat or bridge spikes that was holding these pieces of wood in there.

"Q. Did you examine the switch right across from that? A. Yes, sir.

"Q. The one right across to the west? A. Yes, sir; it was similar to the other.

"Q. What did you find there? A. I think there is a block, in there, of wood."

Continuing, he testified he saw other frogs, switch-rails and guard-rails blocked in the Rosedale yards, estimating the number at one-quarter of the total.

On cross-examination he testified that some of the switch points in the yards, were blocked—several of them. On re-examination he identified the shape and size of the blocking used in the yards as that of a piece of wood exhibited to him by Mr. Cleary while on the stand.

A switchman, Graham, testified he worked in those yards off and on in 1901-2-3-4, and from July, 1905, to September, 1905. The record shows as follows:

"Q. Please state to the jury whether or not there were any switches, frogs or guard-rails in the Frisco yards at Rosedale blocked? . . . A. Yes, sir, there are.

"Q. Could you state how many were blocked? . . . A., Well, sir, I would say that when I first went there—I would say that they were all blocked.

"Q. Well, now, how many were blocked in July, 1905, when you worked there? A. Well, they had from wear and tear and of course going over them, they had become worn a great deal; but I would say that over half of them were in good condition.

"Q. And were the switches blocked? A. Well, the switch points?

"Q. Yes. A. Well, sir, they have a large wooden block that goes about from where the switch point is connected to the rail—the stationary rail, I should say—between two and a half or three feet long that sits between the switch point and the spiked rail—the rail that is stationary."

He also identified the block used as an object lesson, as did Mr. Melton.

On cross-examination he testified:

"Q. Now, what tracks do you say that the switches have blocks in the Rosedale yards? A. Well, I would say all the tracks and every frog and guard-rail and switch point on the east side of Rosedale main line No. 2 has them all blocked.

"Q. The east side? A. The east side of the main line No. 2.

"Q. And you say that was true in 1905, between July and September? A. I say it was true, yes, sir, since—

"Q. (Interrupting) Don't get mad. You say that is true that they have them blocked? A. I say to the best of my knowledge, sir.

"Q. To the best of your knowledge? A. Yes, sir.

"Q. Now, then, did you know this switch where this accident happened? A. I do, sir.

"Q. Was that blocked? A. Yes, sir, they are blocked—whether they are now or not I don't know.

"Q. Well, was it blocked? A. It was blocked, yes, sir. . . .

Newlin v. Railroad.

"Q. Well, was it blocked before that—both of them? A. Yes, sir, they were.

"Q. And you saw it blocked? A. Yes, sir."

A switchman, Hall, testified. He worked in the Rosedale yards in July and August, 1905. His evidence on the point in hand follows:

"Q. State to the jury, Mr. Hall, whether or not the switches, frogs and guard-rails in the Frisco yard in Rosedale were blocked? . . .

"Q. During the time you worked there in July and August, 1905, and prior to August 15, 1905? . . . A. Yes, sir; there was points; guard-rails and some of them were blocked, and some of them were not.

"Q. What per cent of them would you say was blocked? . . . A. Oh, I should say half—any way half of them; perhaps more than half."

Dietch, a switchman, testified. Prior to October, 1904, he had worked in the Rosedale yards two or three months. The record shows as follows:

"Q. Please state whether or not any of the guard-rails, or frogs in that yard were blocked at that time? . . . A. Yes, sir, they were blocked.

"Q. Now, state how the switch points were blocked? A. Why, at the heel of the switch point there was a block similar to that block Mr. Cleary had (referring to "Exhibit 14"), shoved in, and it don't leave a place over an inch after the block is put in, to the heel of the switch points. . . .

"Q. Now, Mr. Dietch, would you state about what per cent of guard-rails and frogs were blocked in that yard? A. Yes, sir. . . .

"Q. State, if you can, what per cent of the guard-rails, switch-rails and frogs of the Frisco yards in Rosedale were blocked, prior to October, 1904? . . . A. Sixty per cent."

Continuing he said he made a special examination of the yards for a particular purpose (which he ex-

plained) on the 18th day of October, 1904. He saw at that time the switch in question and said it was blocked with a block similar to that exhibited to him now. Being asked: "What condition was the block in at that time?" he answered: *"Why, it was in good condition at that time."* On cross-examination he testified that all the switches were blocked on October 18th, 1904, and that he made a special study of them.

Mr. Flanagan was recalled for further cross-examination by defendant's counsel and testified in substance that he had no knowledge of talking to Mr. Cleary about any blocking being in the switch on August 25th, when the photographs were taken.

The foregoing is all the testimony worth while on behalf of plaintiffs as to the blocking of the identical switch and condition of it prior to August 15, 1905.

Defendant put in a mass of testimony from its yard-master, road-master, track-walkers and switch-inspectors, all tending to show that the switch was never blocked at all. It seems defendant acquired the then Rosedale yards from the Ft. Scott and Memphis Railway Company about four or five years before the accident; that at that time they were blocked. Defendant at once adopted the policy of not blocking its yards in Kansas. It seems this was done after a Federal act was passed compelling the use of automatic couplers on cars engaged in interstate commerce. When defendant took charge it reconstructed a part of the Rosedale yards. This reconstructed work is called the new yards as distinguished from that part not reconstructed called the old Memphis or old Ft. Scott yards. There was undisputed testimony that the switch was on what is called the "scale track" which connected with a yard track known as the "main lead," and was in the reconstructed part of the yards. There was undisputed testimony

that the scale track was put in in 1902 by defendant company after it took charge.

Defendant put Mr. Brown on the stand, who took plaintiffs' photographs on August 25, 1905. There being a question whether these photographs showed any blocking at the point of the accident, Mr. Bowen produced the negatives from which the prints were made and testified that the eye could see whether these negatives showed any blocking. On being asked whether they showed any he testified they did not, but that there was a piece of iron shown with three holes in it.

The road-master, Coughlin, having charge of the Rosedale yards for fourteen years, testified he was present when the scale track switch was put in in 1902 as new work by defendant, and that there was no blocking put in it, nor was there any blocking on either side, and that the discarding of blocking was a settled policy of defendant ever since it took charge; that he was familiar with the switch and saw it as much as twice a month ever since it was in and it never had any blocking nor was any attempt made to block it. On cross-examination he testified that in some parts of the yards blocks were put in before defendant's instructions to discontinue blocking, that his blocking was in frogs and guard-rails, but not in switch points, and none of it existed in the remodeled parts of the yards where the scale track was.

Malone, track foreman for 30 years, testified he, himself, put in the scale track switch under the orders of Mr. Coughlin, road-master, in June, 1902, that he put no blocking in it, that there never had been any there to his knowledge and that no one had authority to change the switch except by orders passed through his hands. His cross-examination elicited no contradictory testimony. On redirect examination he said

that he put blocks in the old Memphis yards when defendant's predecessor had charge.

Mr. Ford, who worked in the yards for two years and a half and who knew the scale track and the switch, being over it every day, testified that up to the third day of August, 1905, there was no block in it. That he was track-walker and his duty was to watch switches. On cross-examination he testified that he worked around that switch on the third day of August, 1905, and walked the track that morning.

Buckner, working under Malone in cleaning up the Rosedale yards for several years prior to the trial and in contact with the switch every day, testified there was no blocking there at any time and that he had scratched the dirt out there many times. On cross-examination he testified he was close by the switch when Newlin was killed and looked at it that evening and generally cleaned it out in the evening; that there was some blocking on the "main line," but none in the switch points in the yards; that there was blocking in the old work in the guard-rails; that in blocking up car wheels little pieces of wood would get in the switches and witness would clean them out. On re-examination he explained that the blocks on the main line were not for foot-guards, but were for use in the block signal system on the road and that by "main line" was meant the main passenger track and had no reference to the yards.

Smith, another track-walker, testified as did Buckner.

There was testimony, which we do not find disputed, that the split switch was the latest and most approved device known in switches.

I. On this record it is well, first, by a process of elimination, to get at the questions rightly here; second, to sharply define them.

(a)   In the first place there is no cause of action stated or attempted to be stated for negligence on the part of the engineer in running his train or neglecting signals, nor on the part of the foreman for failure to give or negligently giving signals, or in negligently giving orders, nor because the lift-rod and its appurtenant gear were out of order, nor is it charged that there is any statute in Kansas requiring switch frogs, switch points, split switches or guard-rails to be blocked, nor is there any allegation or proof that this particular defendant ever adopted a policy of blocking split switches in the Rosedale yards or elsewhere on its system in Kansas.   The proof is, as already said, that this particular defendant acquired yards in Rosedale blocked under the management of the then owner of the road, the Fort Scott and Memphis Railroad Company, and on acquiring the property defendant, long before the accident, discarded that system and put in no new blocking.

(b)   Again, this is an action strictly on the laws of the State of Kansas for damages for death by a wrongful act, which statutes, under our own liberal laws, are enforceable in this State on the foot of comity.   [R. S. 1899, sec. 547; Laws 1905, p. 95; Lee v. Railroad, 195 Mo. 400; McGinnis v. Foundry Co., 174 Mo. 225; Root v. Railroad, 195 Mo. 348.]

In this connection we observe: Our statutes (Sec. 547, Laws of 1905, p. 95, *supra*), opening the doors of our courts to causes of action accruing under laws of our sister States, are legislative declarations of comity.   Comity, in a legal sense, is complaisance, courtesy, the granting of a privilege, not of right but of good will.   [Black's L. Dict.—tit. "Comity."] Now, in reason, courtesy in that behalf has its useful limitations—it may not run riot, it goes circumspectly. It must be *courtesy* in fact as well as name.   Some such limitations are: (1) No case under the *lex loci*,

then no case under the *lex fori;* and the supplement, *viz.*: a case under the *lex loci* then one under the *lex fori* (possibly barring actions on statutes strictly penal); (2) in administering the substantive laws of a sister State we administer *them,* not our own; and (3) we should not administer them either more or less blandly than do our sister's courts. This in order, on the one hand, to not refuse jurisdiction by a too sour or cold complexion or to repel it by corroding our sister's law; or, on the other hand, to not *toll, entice and coax* jurisdiction from our sister's courts —thereby (under a mask of courtesy) draining jurisdiction away from them by an enlarged and alluring interpretation in our own.

(c) In this State we have statutes requiring railroad companies to block switches (R. S. 1899, secs. 1123, 1124 and 1125), thus indicating our own legislative policy. Adopted at an extra session in 1887 those statutes were held unconstitutional, the subject thereof not having been designated by the Governor in his call. [Wells v. Railroad, 110 Mo. 286.] They were incorporated in the Revised Statutes of 1889, but that incorporation did not validate them. [Bowen v. Railroad, 118 Mo. 541.] Two sections of the original act were re-enacted in 1891, but one (now R. S. 1899, sec. 1125); was not. Therefore sections 1123 and 1124, requiring switches to be blocked and making it a misdemeanor to not block them and requiring judges of courts having criminal jurisdiction to especially charge grand juries to make inquiry as to violations, are valid laws. But section 1125, providing for procedure in suits under the statute, is still ill with its natal sickness of unconstitutionality. [Brannock v. Railroad, 200 Mo. l. c. 567; Hufft v. Railroad, *ante,* p. 286.]

(d) But Kansas has no statute requiring the use of blocks in switches. The court so told the jury in instruction numbered 21 given for defendant, read·

ing: "The court instructs the jury that under the law of that State defendant was not required to block its switches in the Rosedale yards."

In Lane v. Railroad, 64 Kan. 755, decided so late as the year 1902, it was ruled that the failure to block a railroad switch was not negligence *per se* in Kansas, and that, in order to recover because of the construction of a split switch, plaintiff must show it was not of a proper or approved kind or was of improper or faulty construction.

(e) Where negligence is specified in a petition as a cause of action it has always been ruled by appellate courts in Missouri that the pleaded specifications must be substantially proved as alleged, or that some one, out of several specifications of negligence, constitutive of a cause of action, must be proved as alleged, in order to recover. This is the general law and obtains in Kansas. [Brown v. Railroad, 59 Kan. 70; Telle v. Railroad, 50 Kan. 455.]

II. Keeping in view the propositions announced, it is apparent that plaintiffs in this case pleaded and must prove, *first,* that the specific split switch on the scale track in the Rosedale yards, in which the unfortunate Newlin's heel was caught, had been once blocked; *second,* that the blocking was allowed to decay and become rotten and so disappear; and that, *third,* defendant had sufficient notice of such decay, rotten condition and disappearance to repair. Such is the gravamen of the charge and to that charge the proof must be responsive and sufficient.

Was there any substantial evidence to sustain the charge? We think not. This, because:

Admitting that, in accordance with just rules of law, plaintiffs on demurrer are entitled to have all their testimony, whether contradicted or uncontradicted, taken as essentially true, and are to have allowed to them every reasonable inference to be fairly drawn

from their testimony, then they are entitled to have us assume for appellate purposes that this particular split switch was once blocked, although the great weight of the testimony is the other way and if the jury had found the other way the trial court would not have been justified in disturbing their verdict on that score.    But there is an entire absence of testimony proving or tending to prove that said blocking became rotten and decayed, and disappeared in that way, or that defendant had knowledge of that fact or that such condition existed for such length of time that notice would be imputed.    Plaintiff's testimony tended to show that the block in this switch was in good condition so late as some months before, and no witness testified to any decayed or rotten condition, nor to anything from which it could be inferred that through rottenness and decay the blocking had disappeared for such a length of time before August 15, 1905, as would bring notice home to defendant so that it might be charged with negligence in not repairing.    The ''splinters'' seen by Melton ten days after the accident do not indicate *rottenness* or *decay*.    Under such circumstances we are compelled to hold that plaintiffs made no case on their petition.    We know wood rots, but we may not infer it rots from October, 1904, to August 15, 1905.    We know the block was gone—but when did it go before the accident?

Plaintiffs rely on Lee v. Railroad, *supra,* and evidently labored to plead and try this under the doctrine of that case.    But the facts essentially differ. In the Lee case, in the absence of a statute requiring blocking of frogs and switches, we ruled, in effect, that defendant railway by adopting a system of blocking in its yards *made a law unto itself* and was liable to a servant who in reliance on that self-made rule was damaged by a violation of it.    We stand by that ruling.    But the facts of this case are not that way.

Here it was shown that the predecessor of defendant adopted the blocking system, but the proof is that this defendant on taking charge at once discarded it, and there is no testimony that this particular defendant put blocks in its yards or adopted that plan on its system.

We are forced to consider only the narrow specifications of the pleading and the scanty proof which failed to sustain those allegations.   The demurrer should have been given.

The judgment is reversed.   All concur.