OWEN KIRKDOFFER, Administrator of Estate of CHARLES KIRKDOFFER, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.— 37 S. W. (2d) 569.

Division Two, March 25, 1931.

*E. T. Miller* and *Ward & Reeves* for appellant.

*John H. Bradley, C. O. Inman* and *W. H. Douglass* for respondent.

WHITE, J.—Action for damages on account of the death of Charles Kirkdoffer, which occurred on or about September 16, 1926, near the town of Manila, in Craighead County, Arkansas.

Suit was brought in the Circuit Court of Butler County, Missouri, by the administrator of Charles Kirkdoffer, under a statute of Arkansas providing that where the death of a person shall be caused by the wrongful act, etc., of another, where if death had not ensued the party injured would be entitled to recover in an action for damages, the person or corporation causing the death would be liable in an action notwithstanding the death. Another section of the Arkansas statute provided that the action might be brought by the personal representative of the person killed, and for the benefit of the widow and next of kin of the deceased.

Charles Kirkdoffer left surviving him his widow and two minor children, and suit for their benefit was brought by his son, Owen Kirkdoffer, administrator. Several statutes of Arkansas are set out in the petition and upon them this suit is predicated.

At the point where the accident occurred, Highway No. 18, with a paved roadway sixteen feet wide, ran east and west. Across that highway diagonally from southeast to northwest ran the track of the defendant's main line. September 16, 1926, Charles Kirkdoffer in a Ford coupe was going east on the highway approaching the railroad track. At the same time a train was coming from the southeast. With Charles Kirkdoffer was John Southard, who was driving. The "train" on the railroad track consisted of a motor car, called by the engineer a "Bull Moose." It was a single car with a trailer, and carried mail, baggage and express. A gasoline engine furnished the propelling power. The "crew" operating the train consisted of the engineer—a one-man crew. A baggageman, a brakeman and a conductor were also on the train. About fifteen passengers were in the motor car. The evidence for the plaintiff shows that the automobile in which Kirkdoffer was riding was traveling at about the same rate of speed as the train—25 or 30 miles an hour. The country was practically level; the railroad track a little above the level. Owen Kirkdoffer, son of the deceased, testified that he was driving a car about 600 feet behind his father and Southard, and he saw the approaching train about 800 feet from the crossing. He saw it at intervals until the collision; when he drove up his father and Southard both had been killed by the collision. The train was in sight at all times within the distance mentioned by him. By

one measurement it ran two hundred and ninety-one feet after the collision. Others estimated the distance to be three hundred feet, and one witness said about two hundred and seventy-five feet. Apparently there was no diminution of speed until the collision. The jury returned a verdict in favor of the plaintiff for $25,000, and in due course the defendant appealed to this court. The case was tried on the theory that Kirkdoffer and Southard, being partners, any negligence of Southard in driving was attributable to Kirkdoffer.

I. The Act of 1927 by the Missouri General Assembly (Laws 1927, p. 156) provides that in every action wherein the law of another State is pleaded the courts of this State shall take judicial notice of the public statutes and judicial decisions of such State. That section brings into this case all the statutes of Arkansas affecting the cause of action stated and the decisions of the Supreme Court of Arkansas construing such statutes.

Among the several statutes set out in the petition is Section 8562, Crawford & Moses' Digest, as follows:

"All railroads which are now or may be hereafter built and operated in whole or in part in this State shall be responsible for all damages to persons and property done or caused by the running of trains in this State."

On this statute the court gave instruction No. 1 at the instance of the plaintiff, as follows:

"The court instructs the jury that it has been shown by the evidence in this case that Charles Kirkdoffer was killed on the public road crossing over the defendant's tracks near the town of Manila in the State of Arkansas, on or about the 16th day of September, 1926, by one of defendant's trains, and, under these circumstances the court instructs you that under the law of this case plaintiff has made a prima-facie case of negligence against the defendant for causing the death of Charles Kirkdoffer, and it will be your duty to find a verdict for Owen Kirkdoffer, administrator and plaintiff in this case, and against the defendant St. Louis-San Francisco Railway Company, unless the defendant railroad company proves by the greater weight or preponderance of the evidence that it was not guilty of any negligence that directly contributed to cause the death of decedent, or, that decedent or the driver of the automobile was guilty of negligence equal to or greater than defendant's (if any), that directly contributed to cause the death of decedent."

The appellant assigns error to the giving of that instruction. In support of it the plaintiff cites several Arkansas cases, and Hiatt v. St. Louis-San Francisco Ry. Co., 308 Mo. 77, l. c. 100, 101, where the Arkansas decisions are quoted to the effect that when a person is injured or killed by a railroad train the law will indulge the

presumption that it was negligently done, which presumption inheres in the case.

The effect of the ruling is that a plaintiff makes out a prima-facie case by showing the death or injury was caused by the defendant's train. The burden is then upon the defendant to prove it was not negligent. In the Hiatt case it was held that the statute created a substantive right. It was not a mere matter of procedure in which the Missouri law would apply. An instruction, such as number one, was in accordance with Arkansas rulings cited. However, since that case was decided the Supreme Court of Arkansas, following the construction of the statute quoted by Federal Supreme Court, has held that the prima-facie presumption against the defendant in such case, would vanish whenever the railroad company or the person causing the death or injury offered proof to show how it occurred. [St. Louis-S. F. Ry. Co. v. Cole, 27 S. W. (2d) (Ark.) 992.] There the plaintiff's mules, being left unhitched, strayed with his wagon upon the railroad track and were killed. The plaintiff in the trial court recovered judgment which was reversed. The operatives of the train testified that they kept a lookout and they could not see the mules until too late to stop the train or avoid striking them. No evidence was offered to the contrary. The court said, l. c. 993, that it was the established doctrine that under section 8562, when an injury is caused by a railway train, a prima-facie case of negligence was made out against the company operating the train, but quoted approvingly from the United States Supreme Court considering a statute of Mississippi similar to the Arkansas statute where that court said:

"The only legal effect of this inference is to cast upon the railroad company the duty of producing some evidence to the contrary. When that is done the inference is at end, and the question of negligence is one for the jury upon all of the evidence."

The court quotes further:

"The statute does not . . . fail in due process of law, because it creates a presumption of liability, since its operation is only to supply an inference of liability in the absence of other evidence contradicting such inference."

The conclusion was that if that presumption or inference is to prevail after evidence to the contrary it would violate the due-process provision of the Fourteenth Amendment.

Instruction No. 1 submitted to the jury the question of fact whether the defendant was negligent in a manner to cause the death with that prima-facie presumption weighing against any evidence produced by defendant.

Defendant introduced evidence to show that the operator of the train kept a lookout for persons who might be upon the track, gave the statutory signals required by the Arkansas statutes, and did

not and could not discover Kirkdoffer's peril until too late to avoid striking him. The instruction was therefore erroneous. It was erroneous also because it authorized a verdict for plaintiff if defendant was guilty of *any* negligence, greater than the negligence of the driver of the Ford, that directly contributed to the death. It should have limited consideration to the specific negligent acts alleged in the petition.

II. Plaintiff pleaded and introduced the Lookout Statute, Section 8568 (Arkansas) Crawford & Moses' Digest, as follows:

"It shall be the duty of all persons running trains in this State upon any railroad to keep a constant lookout for persons and property upon the track of any and all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad shall be liable and responsible to the person injured for all damages resulting from neglect to keep such lookout, notwithstanding the contributory negligence of the person injured, where, if such lookout had been kept, the employee or employees in charge of such train of such company could have discovered the peril of the person injured in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed."

That "Lookout Statute," plaintiff says, is declaratory of the common-law humanitarian doctrine. Defendant complains of error in giving instructions 2 and 4 for plaintiff, declaring it the duty of employees in charge of the train to keep a constant lookout, and instructing the jury that if they saw or by keeping constant lookout could have seen the peril of those in the automobile, or if an employee could have been placed on the train in a position, by keeping a constant lookout, to have stopped or checked the train or to have sounded an adequate warning, they should find for plaintiff, even though the occupants of the automobile were guilty of negligence that contributed to the death.

The defendant claims there was no evidence upon which to submit the case on the humanitarian rule.

Engineer Penick testified:

"I saw this automobile before it got to the crossing; it was something like 250 or 300 yards from the crossing at the time. I saw it practically from then on until I got in about 60 feet of the crossing, then my view was cut off and I did not see it any more. I saw it until it got in about 60 feet of the crossing; I was whistling and the bell was ringing and I supposed that the men would stop; the

front end of the train cut my view off and I did not see the car after it got in about 60 feet of the crossing. My position in the cab is on the right hand side; the instruments that I operate the train with are where I can reach them from my position.''

The effect of his evidence which is not contradicted by any evidence offered by plaintiff, was that in keeping a lookout he could not get away from the instruments by which he could operate the train. After coming within 60 feet of the crossing the approaching Ford was lost from view. He might have seen it by changing his position in the car. If he had done so, he would have been helpless either to stop the train, slow it down, or sound an alarm, because he would have been out of reach of the controls.

The witness then was asked and answered the question as follows:

''Q. If you were back, say the front end of your engine was back fifteen feet from that crossing, could you see an automobile, say ten or fifteen feet off from the crossing, if it was approaching you? A. Yes, sir, I did see that one.''

J. W. Dolen, the conductor on the train, testified that he did not see the automobile approach the crossing. He was in the smoking compartment and had nothing to do with the mechanical operation of the train.

N. A. Beard, the brakeman, testified:

''I saw this automobile in question as it approached the crossing; when I first saw it I think it was about a quarter of a mile from the crossing. It seemed to be going about 25 miles an hour; the train was also going about 25 miles or better. I judge it was going about 28 miles an hour. When I last saw the automobile the Moose hit it; I saw it when it was struck. As it approached the crossing the automobile seemed to hold its gait. Before the train reached the crossing, and on up until it reached the crossing, the bell was ringing and the whistle was blowing. I was sitting down in the coach at that moment. I guess this automobile was about fifteen or twenty feet of the railroad track before I discovered that it was not going to stop. There was nothing I could do at that time to prevent the collision.''

A. G. Anderson, a passenger on the train, witness for defendant, said he saw the automobile as it approached the crossing, and further, on cross-examination, affirming his testimony at a former trial:

''Q. Where was it; that is, with reference to the crossing, when you first saw it? A. It was on my left, I judge about 250 or 300 yards up the road.

''Q. How long did you continue to observe it, if at all, up to or close to the crossing where the accident occurred? A. I never noticed it until the brakeman called my attention to it. He said, 'It looks like they are going to hit that car.' Then I took particular notice. That was the first time I took any particular notice of it.

"Q. How close was it to the track when he said that? A. It was right at the track.

"Q. About how many feet from the track was it at that time? A. I imagine it was about 50 feet from it.

"Q. Up to that time you thought it was going to stop? A. I thought so, yes, sir.

"Q. Do you remember those questions and answers? A. Yes, sir, I do."

Owen Kirkdoffer testified that he was driving 600 feet behind the coupe in which his father and Southard were riding; he saw the train about 800 feet from the crossing and he kept the Ford in sight more or less from then until the collision. The witness did not mention anything in the movements of the Ford to apprise the operator of the train that its occupants intended to go on across in front of the train. One James Banks, witness for the plaintiff, testified that he was driving about 300 or 400 feet behind the Ford coupe in which Charles Kirkdoffer was riding. He saw the train before the collision occurred, said an automobile going about 25 miles an hour could be stopped with safety in about fifty feet. The train was in plain view of the men in the Ford all the time.

Since it is a known practice for people to drive up to a railroad crossing without slowing down until they get near the track, the operatives of the train had a right to assume that the men driving the Ford would stop before driving into danger so apparent. There was evidence on the part of the plaintiff to show that the bell was not rung nor the whistle sounded, which would have warned Kirkdoffer of the approaching train. But the very witnesses who testified to that said they noticed it because they heard the train. Some of them, at much greater distance from the crossing than the Ford coupe was, heard the rumble of the train on the track as it came down through the fields. One witness said he heard the exhaust of the train; he looked up and saw it about a quarter of a mile away. Others heard the train running. One of plaintiff's witnesses swore that the running of the train could be heard a half mile away. He was approaching the crossing from the other side in a cotton wagon, which no doubt was making as much or more noise than the automobile in which Kirkdoffer was killed. Owen Kirkdoffer swore that Charles Kirkdoffer's sight and hearing were good. If a witness could hear the train at the distances mentioned, the persons in the Ford, being very much closer, could have heard it when it was at a sufficient distance that they might have stopped. If they heard it or saw it a warning was not necessary to apprise them of its coming. All this the engineer must have known, for he could not have been unaware of the noise his train made, and no facts are shown by plaintiff from which the engineer could have been aware that the occupants of the Ford were oblivious of dan-

ger.  Evidently the engineer for the first time saw that it was not going to stop when he was within ten or fifteen feet of the crossing.  It was too late then for him to appreciably lessen the speed or sound an alarm which would be of any avail.  His attempt to sound an alarm could only be executed in the fraction of a second required to reach the short distance to the place of the collision. And had he sounded it instantly when the automobile was ten or fifteen feet from the track it would have availed nothing, because on the plaintiff's own testimony the automobile could not have been stopped before it reached the track.  The sole question on this feature of the case is whether there was anything in the movements and conduct of the Ford to indicate that it was going on across ahead of the train until too late to avoid the collision.  No evidence offered by plaintiff tends to show such intention.  It may be said that a sharp blast of the whistle when he was a hundred or sixty feet away might have attracted the attention of the men in the Ford and have caused them to stop.  But when he was sixty feet away he saw the Ford and saw nothing to indicate that it was going on across, and then it passed out of his sight until it was within ten or fifteen feet of the track.

Instruction 2, further tells the jury:

"If no employee was in a position where he saw, or by keeping a constant lookout could have seen, the automobile, and an employee could have been placed in the train in a position where by keeping a constant lookout he could have seen the automobile in a position of peril of being struck by the train" in time to avoid the injury and yet failed to do so, etc., the verdict should be for the plaintiff.

Plaintiff's counsel have cited no Arkansas ruling and we have found none which construes the Lookout Statute to require a resort to that expedient in order to discover persons or property in peril on a railroad track.  The statute imposes the lookout duty only upon "all persons running trains."  It does not require the employment of extra help with no other duty than to keep a lookout.  Besides there is no evidence that an extra watchman could have been placed in a position to see the approaching automobile after it passed out of sight of the engineer, 60 feet from the track, and to become aware of the intention of its occupant to drive on across the track, in time to signal the engineer so that the latter could prevent the collision.  The brakeman served the purpose of such a watchman for he saw the automobile all the time and did not discover that it was not going to stop until too late.  We think the evidence did not justify a submission of the issue of liability under the humanitarian rule, so that all instructions embodying that feature were improperly given.  [Jemell v. St. Louis Southwestern Ry. Co. (Ark.), 11 S. W. (2d) l. c. 450.

III. The plaintiff offered in evidence Rule 561 in the Book of Rules promulgated by the defendant Railroad Company, as follows:

"Railroad crossings and other hazardous places must be approached with train under such control as to absolutely prevent running over crossings before stopping."

The defendant objected and upon its objection being overruled offered evidence to show that Rule 561 was under the heading "Enginemen," being instructions to engineers, and then offered other rules, among them Rule 31, to the effect that the engine bell must be rung upon approaching public crossings at grade, and other rules relating to the duty of engineers approaching double-track junctions, railroad crossings at grade, or drawbridge. Defendant claimed that Rule 561 did not apply to a crossing of a highway, but only to a railroad track crossing another railroad track. The natural meaning of "railroad crossing" is the crossing of a railroad track. One traveling on a highway and approaching a "railroad crossing" sign would know that the highway crossed the railroad track, but an engineer on a train coming to a highway would know it was a highway crossing. To him a railroad crossing is the crossing of another railroad. The rule is connected with "other hazardous places." Hazardous to the train approaching the crossing; it is a direction to engineers for the protection of trains and the property of defendant under their charge. Defendant also offered to prove that Rule 561 was so understood and acted upon by the employees of defendant. The evidence was excluded. Even if the rule were ambiguous, in offering it the plaintiff should have shown that it was treated as applicable to a railroad crossing a highway. Otherwise it was not admissible at all. The rule was not shown to have been known to Kirkdoffer, to his companion or to the public, or that the knowledge of it would in any way have affected his action in approaching the track. The only purpose of introducing it in evidence was to show that the engineer did not perform his duty as directed in the rule. That being so, evidence showing the interpretation of the rule by the company which promulgated it and by the men to whom it was directed should have been admitted.

IV. The plaintiff pleaded and offered in evidence Section 8575, Crawford & Moses' Digest, Arkansas Law, as follows:

"In all suits against railroads, for personal injury or death, caused by the running of trains in this State, contributory negligence shall not prevent a recovery where the negligence of the person so injured or killed is of less degree than the negligence of the officers, agents or employees of the railroad causing the damages complained of; provided, that where such

contributory negligence is shown on the part of the person injured or killed, the amount of the recovery shall be diminished in proportion to such contributory negligence.''

This is called the Comparative Negligence Statute. The violation of this statute was submitted to the jury under instructions given by the plaintiff. Appellant assigns error to the giving of such instruction on the ground that the evidence did not warrant it.

Instructions numbered two and four not only submitted the case upon the theory that the section was violated, but submitted it upon the humanitarian doctrine as it is formulated in the Lookout Statute. Both instructions were erroneous for that reason.

V. But the case was submissible upon the primary negligence of the defendant in failing to sound the whistle or ring the bell, as required when approaching the crossing.

The defendant introduced a number of witnesses some of whom were working in the cotton field near the crossing and testified that the whistle was sounded and the bell rung at another crossing a half-mile or three quarters of a mile back of this particular crossing, and that the bell continued to ring and the whistle to blow as they approached the crossing where the accident occurred.

The plaintiff then in rebuttal offered a half dozen or more witnesses who were equally well placed to see the train and hear any signal given, who testified that the bell was not rung after the train left the previous crossing and the whistle was not sounded until the very moment of the impact in which Kirkdoffer was killed. Some of these witnesses were those who testified they could hear the rumbling of the train. It was a question for the jury whether a blast of the whistle or the ringing of the bell would have brought the approach of the train more vividly to the attention of the men in the Ford as they approached the crossing. The presumption or inference arising from the accident vanished when the defendant introduced the evidence. It then became a question for the jury upon all the evidence as introduced whether the statutory signals were given and whether the failure to give them was the cause of the death, and whether the negligence of Kirkdoffer and his companion was of less degree than the negligence of the defendant's engineer. [Ramey v. Mo. Pac. Ry. Co., 21 S. W. (2d) (Mo.) 873, l. c. 876; Mo. Pac. Ry. Co. v. Foresee, 26 S. W. (2d) (Ark.) l. c. 109; St. L. & S. F. Ry. Co. v. Cole (Ark.), 27 S. W. (2d) l. c. 994.]

The judgment is reversed and the cause remanded. All concur.