St. Louis-San Francisco Railway Co. *v.* Pace.

4-4496

Opinion delivered January 25, 1937.

*J. W. Jamison, E. L. Westbrooke, Jr.,* and *E. L. Westbrooke,* for appellants.

*Herman Horton, Gordon Frierson* and *Roy Penix,* for appellee.

GRIFFIN SMITH, C. J.   Lowen Pace, as administrator of the estate of A. F. Pace, secured judgment for $2,950 against J. M. Kurn and John G. Lonsdale, trustees for the St. Louis-San Francisco Railway Company, and the trustees have appealed.

Although numerous assignments of error are urged by appellants, detailed consideration of these is pretermitted because we think the case turns on whether there should have been an instructed verdict for defendant.

It is alleged that on September 5, 1935, appellee's intestate was walking along the railway, going north from Bono, in Craighead County.   About a mile and a quarter from the town, at a point where the track was level and the view unobstructed for a considerable distance, Pace was struck by a train and killed.   He was seen at Bono about eight o'clock.   W. D. Farrow, a merchant, testified that the night Pace was killed he was in his store, and Farrow thought he was tipsy.   His breath smelled like beer, but "the old man was not down drunk. He could take care of himself, and seemed to get about all right."   Another merchant saw Pace in his store about eight o'clock, making a small purchase.   Pace was at a filling station in Bono about 8:30.

Passenger train No. 106, from Memphis, passed the scene of the tragedy about 9:30 o'clock, followed shortly thereafter by a freight train.   These were the only northbound trains during the night.   Early next morning Pace's mangled and dismembered body was found on the east side of the track.   There was a well-defined path about six feet wide on either side of the railway, ordinarily used by pedestrians.   Parts of the remains were against the ties and the rail spikes, but not between the rails.

A witness who frequently walked along the railroad at night when trains were approaching from the south said that he could see a man walking up the track for half, or three-quarters, of a mile, but "with a man lying down it would be a different proposition. If this man had been lying down by the side of the track and I had been a thousand feet away looking in the direction the headlight was shining, don't think that I could have seen him. If I had been standing when the engine passed, a half or three-quarters of a mile from where the body was found, and Pace had been lying there by the side of the track, I could not have told that he was there."

A former railway fireman and engineer, whose knowledge of railroading went back 36 years, thought that with ordinary headlights a person walking on the track could be seen a quarter of a mile away, and the kind of trains that went through Bono could be stopped within a quarter of a mile, "or in an emergency, less than that." His impression was that such trains made 40 or 45 miles an hour, and that they could be stopped within ten rail lengths, or 333 feet. "On a clear night, if you are standing and looking in the direction the train is running, you can see a man on the track a quarter of a mile away if he is walking. If he is lying down you can't see him so well; couldn't likely see him at all."

The engineer for passenger train No. 106 testified that the track is straight from Bono three miles north. On the night in question there was nothing to obstruct his vision. The headlights were such that a man standing on the track could be seen at a distance of from 800 to 1,000 feet. The train was making 60 miles an hour. When passing Bono he was looking straight ahead through an open window of the cab. At all times, after leaving Bono, he maintained a constant lookout, and there was nothing on the track. Regulations required that the engine be examined at Hoxie. This inspection was made, and nothing was found on the wheels, or on the pilot or pilot beam, or elsewhere, to indicate that anything had been hit. "When a locomotive strikes something living, flesh and blood get on the wheels, and

you detect it when inspecting the engine. The manner in which I can tell whether I have struck anything that is alive is that the first time you put the brakes on with the train going fast, or with a heavy train, the brakes get hot, and there is an odor that comes from the hot brakeshoes. There was no odor that night to indicate that we had struck anything. I kept a constant lookout and inspected the engine at Hoxie, and we did not strike a man between Hoxie and Bono. If I had struck a human being I would have stopped.'' The fireman on train No. 106 testified that he, too, had kept a constant lookout, and that there was no one on the track between Bono and Hoxie. Testimony of the engineer and fireman for the freight train was to the same effect.

The case was tried on the theory that there had been a failure upon the part of appellants to exercise that degree of care enjoined by § 8568 of Crawford & Moses' Digest, which makes it the duty of those operating trains to keep a constant lookout for persons and property. It provides that if any person shall be killed or injured through neglect to keep such lookout, a recovery may be had ''notwithstanding the contributory negligence of the person injured, where, if such lookout had been kept, the employee or employees in charge of such train of such company could have discovered the peril of the person injured in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed.''

The body of appellee's intestate was found in circumstances which give rise to a presumption that, while trespassing on appellant's property, he was killed by a train. The questions in issue therefore are: (1) Was there a failure to keep a constant lookout? (2) Was appellee's intestate also negligent? (3) If appellant was negligent in keeping a lookout, and there was contributory negligence upon the part of appellee's intestate, could the peril have been discovered in time to prevent

injury, by the exercise of reasonable care, if the lookout had been kept?

Appellee relies principally upon two decisions of this court, *St. Louis-San Francisco Railway Co.* v. *Crick,* 182 Ark. 312, 32 S. W. (2d) 815, and *Missouri Pacific Railroad Co.* v. *Grady,* 188 Ark. 302, 65 S. W. (2d) 539.

In the Crick case the facts were somewhat similar to those now under consideration. The body of the man for whose wrongful death compensation was sought was found early one Monday morning near the railroad. He had been seen alive Sunday afternoon. There were no eye witnesses, and physical circumstances constituted the evidence as to the instrumentality of death. The defendant, without offering any proof, moved for a directed verdict. In deciding the case there was reference to the construction placed upon § 8568 of Crawford & Moses' Digest in *St. L. I. M. & S. R. Co.* v. *Gibson,* 107 Ark. 431, 155 S. W. 510, where it was said: ''We think the construction there placed upon the act applies to persons alike, and that the railroad company now owes the same duty to keep a lookout to avoid injuring the trespassers upon its tracks, and that, upon proof of injury to such person by the operation of its trains under such circumstances as to raise a reasonable inference that the danger might have been discovered and the injury avoided if a lookout had been kept, a *prima facie* case is made, and the burden of proof then devolves upon the railroad company to show that a proper lookout was kept as required by the statute, and that it used ordinary care to prevent the injury to the person after his discovery in a perilous position in order to escape liability for such injury.''

It will be observed that the defendant did not meet this burden, no proof whatever having been offered.

In *Missouri Pacific Railroad Co.* v. *Grady,* 188 Ark. 302, 65 S. W. (2d) 539, there were no eye witnesses, and a *prima facie* case was made through proof of the finding of the body. The opinion includes this statement: ''The enginemen both testified that a constant lookout was kept, that they did not discover him or his perilous

position without any explanation tending to show why it could not have been done and the fact remains that the man was killed on the railroad track, all of the surrounding circumstances indicating that he was struck while walking on the track.'' There was an attempt to overcome the *prima facie* showing of negligence, but there is an express finding that all the circumstances indicated that the man ''was struck while walking on the track.''

In the case under consideration four operatives testified that a man standing or walking on the tracks could have been seen, and that appellee's intestate was not standing or walking, nor was he on the track. There was testimony by appellee's own witnesses that a man lying down by the side of the rails probably could not have been seen.

The status of a trespasser on railroad property is discussed in *St. Louis-San Francisco Railway Co.* v. *Williams,* 180 Ark. 413, 21 S. W. (2d) 611. In that case the plaintiff was injured while walking between the main rail line and a sidetrack within the city limits of Blytheville. The accident occurred on a curve. The engineer testified that he was keeping a lookout, but on account of the curve and the presence of box-cars on the sidetrack, he could not see plaintiff until within about forty feet of her. He applied emergency brakes, but before a stop could be made the injury occurred. There was a verdict for compensation.

After finding that appellee was a trespasser, the opinion says: ''The only duty owing to her, as a trespasser under the common law, was to exercise ordinary care under the circumstances to avoid injuring her after discovering her presence on the track and consequent peril. But, by § 8568 of Crawford & Moses' Digest, it is made the duty of all persons running trains in this state to keep a constant lookout for persons and property on the track.'' After quoting the substance of the law, the opinion continues: ''This statute has been construed and applied in numerous cases arising under it, and no useful purpose would be served to review them. In one of the latest of these cases—that of *Kelly* v. *De-*

*Queen & Eastern R. R. Co.,* 174 Ark. 1000, 298 S. W. 347— we said: 'We do not think the railroad company is liable for hitting a trespasser on the track unless the plaintiff shows that the injury might have been avoided if a proper lookout had been kept,' by which was meant, as is made plain by other portions of the opinion from which we have just quoted, that it must be shown by the person asserting liability that the injury complained of was inflicted at such a place and under such circumstances that the presence of the injured party or property would have been discovered had the lookout required by the statute been kept. Upon such a showing being made, the burden then shifts to the railroad company to show that the duty to keep a lookout had been performed, and, to escape liability for the injury complained of, the railroad company must also show that the injury was unavoidable by the exercise of ordinary care.'' The court then said that there was no contradiction of the testimony of the engineer by any of the numerous witnesses. ''As there was no fact or circumstance in evidence substantially contradicting the testimony of the engineer it was an arbitrary act on the part of the jury to disregard this testimony. *St. L. S. F. R. Co.* v. *Harmon,* 179 Ark. 248, 15 S. W. (2d) 310. If the engineer's testimony is accepted as true, as it should have been in the absence of any contradiction thereof, or if his testimony did not appear of itself to be so unreasonable or improbable as not to be worthy of belief, then there was no negligence on his part.''

Tested by this rule, was there sufficient evidence to go to the jury in the case now under consideration? There was no personal testimony as to any negligence. On the contrary, appellant's servants consistently insisted that no one was on the track. The circumstance opposing these assertions is that the headlights were sufficiently powerful to have disclosed the presence of a man in time for effective application of the brakes, if he had been standing or walking. There is the additional fact that the man was killed.

In order to sustain the verdict, it would be necessary to wholly disregard the testimony of appellant's servants, and to hold that the mere finding of a mangled body on a track over which trains had been recently operated, coupled with the admission by appellant that it maintained efficient headlights, would establish a *prima facie* showing which could not be overcome by the reasonable testimony of men who controlled the train. The testimony of one of appellee's own witnesses that Pace was "tipsy" shortly before leaving Bono, and the showing in physical facts that no parts of the body were between the rails, are circumstances from which it might be inferred that the unfortunate man was sitting or reclining on the outside of the rails, and that reasonable diligence upon the part of the engineer would not have disclosed his presence.

Whatever the facts may have been as to the situation of appellee's intestate at the time he was struck, there was not sufficient evidence upon which to predicate a finding of negligence without arbitrarily disregarding testimony of witnesses in favor of a theory equally hypothetical.

We conclude, therefore, that the *prima facie* showing made by appellee was overcome by the testimony of appellant's servants, which was contradicted only by inferences based upon speculation.

The judgment is reversed, and the cause dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.