MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE, *v.* PENNY.

4-5798 137 S. W. 2d 934

Opinion delivered March 11, 1940.

*Henry Donham* and *E. W. Moorhead,* for appellant.
*O. E. Westfall* and *L. B. Smead,* for appellee.

GRIFFIN SMITH, C. J. We determine whether appellant's evidence was sufficient to overcome the statutory presumption of negligence[1] arising from the fact that the dead body of appellee's son was found beside the railroad.

George Penny was killed August 7, 1936. His body was found outside the rails in such condition that reasonable minds would agree he had been killed by a train. For a distance of 25 or 30 feet blood and particles of flesh were found. The track where the tragedy occurred is straight for half a mile in each direction and passes through a wooded area. The right-of-way is inclosed. There is no adjacent foot pathway. The nearest crossing—one in either direction—is half a mile distant.

Presumably Penny was killed by freight train No. 276. It left Camden about 3:30 a. m. From Camden to where the body was found is 10 or 11 miles.

Preceding his death Penny had been in Camden during the afternoon and part of the night. It was stipulated that if called as a witness Evalina Everett would have testified that she went with Penny to the railroad about 1:30 in the morning and saw him start walking north. His mother's home was five or six miles from where the body was later found, and could be reached by either of the two highways, mentioned *supra.*

---

[1] Pope's Dig., § 11144.

Counsel for appellee say: "Testimony as to the place where the body was found and the indications of blood and flesh on the track and rails and the condition of the body indicate definitely that he was struck by the engine, and did not fall between the cars."

It is contended by appellant that a stop at Camden for water afforded Penny an opportunity to board the train; that he probably rode to a point between the two crossings, and in trying to get off, accidentally fell and was run over.

Appellee's argument, based upon inferences that might be drawn from testimony of engineer Keltner, is that if a person falls between two cars the body is ordinarily thrown a considerable distance from the rails; that conditions pertaining to Penny's body and circumstances in which it was found were of evidential value and properly went to the jury where the question was whether Penny was killed in consequence of his own miscalculations in attempting to leave the moving train, or was struck by the engine because of inattention of train operatives.

On behalf of appellant there is testimony that Penny was drinking late into the night at Camden; that he was waiting for a freight train; that the train, after stopping for water in the city's outskirts, passed the station slowly on an upgrade (perhaps five or six miles an hour), and that an able-bodied man could board it.

Keltner says he was keeping a lookout. It is suggested that the engineer's statement is qualified by his admission that he had no specific recollection in respect of attention or inattention at the time and place in question. A quotation from the testimony is:

"I was keeping a lookout that night as I passed that location. It is our duty to keep this lookout—to watch for any object on the track. I don't remember that night from any other night, or that particular place from any other place on the road. It is my duty to keep a lookout at all times. That is the reason I say I was keeping a lookout. Outside the rules [requiring such] we keep a lookout for our own safety."

On cross-examination the engineer said: ''When we are out in the country away from towns and highways we keep a lookout every instant. . . . We never turn our attention to something else. We sit there and watch all the time.''

The engineer further testified that when he reached Gurdon about six o'clock the customary examination of the engine was made. There were no indications of blood or flesh on it. If live objects are hit, ordinarily evidence of the contact is left.

Our construction of Keltner's testimony is that he said he was keeping a lookout. It would be unreasonable, after a lapse of three years, to expect him to remember specifically having passed an isolated section on his run at a particular time. It is doubtful if anyone would have believed him if he had affirmed a distinct mental impression of rails, ties and roadbed brought forward through time from the fleeting seconds during which the train was passing the identified point. Keltner's frankness in saying he knew he kept a lookout because it was his duty to do so, that his habits were fixed, and that he knew he was doing his duty, is commendable.

We have often held to be competent the negative testimony of a witness who says he was near the railroad when an accident occurred; that his sense of hearing was not impaired, and that if the train's whistle had been sounded or the bell rung he would have heard it. In principle such testimony is similar to that of the engineer in the instant case. In each illustration there is no recollection of what occurred. There is no consciousness or sensibility of the transaction. Applying the rule of common sense and considering the experiences of mankind, courts say that if a normal person is near a train and does not hear the signals required by law to be given, a jury may conclude that the signals were not given.

By the same rule of reason an engineer who knows he kept a constant lookout may testify that he did keep such lookout, and such evidence may not be arbitrarily disregarded. Of course a jury is not required to believe

testimony of this character to the exclusion of or in preference to other reasonable evidence. If the testimony is in conflict, or if challenging circumstances which rise to the dignity of evidence exist, it may be disbelieved. But it cannot be *arbitrarily* rejected. A legal presumption is overcome by *any* substantial testimony.[2]

In the absence of direct evidence in the case at bar to show how the death occurred, there was only the original presumption that Penny was killed because of the negligence of appellant's agents. Such presumption was at an end when the defendant produced proof that the lookout statute was not being violated.

To reach its verdict the jury, without proof, had to assume that Penny, after leaving the Everett woman, did not board the train; that he walked up the track and was on or near it in a position to be seen by the engineer or fireman, and that he was struck by the engine; that the train operatives were not keeping a lookout; that if attentive to duty they would have discovered the trespasser's perilous position in time to avoid striking him.

The case is controlled by decisions mentioned in the footnote.[3]

Appellee thinks authority for the judgment is found in *St. Louis-San Francisco Railway Company* v. *Crick.*[4] There cannot be analogy because certain controlling facts are different. In the Crick Case the railway company did not introduce ". . . any testimony of the operatives of its train." There is this statement in the opinion: "Proof of the injury under such circumstances as to raise a reasonable inference that the danger might have been discovered and the injury avoided if a

[2] *Western & A. R. R. Co.* v. *Henderson*, 279 U. S. 639, 49 S. Ct. 445, 73 L. Ed. 884; *St. Louis-San Francisco Railway Company* v. *Cole*, 181 Ark. 780, 27 S. W. 2d 992; *Missouri Pacific Railroad Company* v. *Beard, Adm'r*, 198 Ark. 346, 128 S. W. 2d 697; *Missouri Pacific Railroad Company* v. *Ross*, 199 Ark. ___ , 133 S. W. 2d 29; *St. Louis-San Francisco Railway Co.* v. *Mangum*, 199 Ark. ___, 136 S. W. 2d 158.

[3] *St. Louis Southwestern Railway Company* v. *Pace*, 193 Ark. 484, 101 S. W. 2d 447; *Missouri Pacific Railroad Company* v. *Ross, Adm'r*, 194 Ark. 877, 109 S. W. 2d 1246; *Porter* v. *Scullin et al., Receivers Missouri & North Arkansas Railroad Company*, 129 Ark. 77, 195 S. W. 17.

[4] 182 Ark. 312, 32 S. W. 2d 815.

proper lookout had been kept and reasonable care exercised after the discovery of the peril to prevent the injury, made a *prima facie* case of liability devolving the burden upon the railroad company to show that a proper lookout was kept . . ."

For the error in not instructing a verdict for the defendant, the judgment is reversed. The cause has been fully developed, and it is therefore dismissed.

Mr. Justice HUMPHREYS and Mr. Justice. MEHAFFY dissent.

MEHAFFY, J. (dissenting). I do not agree with the majority opinion in reversing this case. The majority opinion says, among other things, that "conditions pertaining to Penny's body and circumstances in which it was found, were of evidential value and properly went to to the jury, where the question was whether Penny was killed in consequence of his own miscalculations in attempting to leave the moving train, or was struck by the engine because of inattention of train operatives." There is no evidence in the case showing that he got on the train anywhere. The train did not stop at Camden, but went through there at about six miles an hour; but the railroad men say that an able-bodied man could get on a train at six miles an hour. There is no evidence that he was about the water tank where the train stopped; and the undisputed evidence is that he started walking down the track towards home quite a while before the train came.

The majority opinion then quotes from the testimony of Keltner, the engineer, that he knew he was keeping a lookout because he always did and the rules required-it, and he kept it for his own safety, and at the end of the run he examined his engine and found no blood or any other indication that he had struck anyone. The majority opinion then said: "Our construction of Keltner's testimony is that he said he was keeping a lookout. It would be unreasonable, after a lapse of three years, to expect him to remember specifically having passed an isolated section on his run at a particular time. It is doubtful if anyone would have believed him if he had

affirmed a distinct, mental impression of rails, ties and road bed brought forward through time from the fleeting seconds during which the train was passing the identified point. Keltner's frankness in saying he knew he kept a lookout because it was his duty to do so; that his habits were fixed and that he knew he was doing his duty, is commendable.''

What does this court know about his frankness? It did not see him, hear him testify, had no opportunity to observe his conduct and demeanor on the stand, and had none of the facts, to judge of his truthfulness, that the jury had. The trouble about the majority opinion is that it not only holds that Keltner was frank, although the judges never saw him, but it holds that he told the truth, in the face of the fact and the law is that the jury are the judges of the credibility of the witnesses and the weight to be given to their testimony. Everyone knows that you may hear a witness testify, observe his demeanor on the stand, and frequently be able to tell from his manner and testimony, whether he is telling the truth. And this court has many times approved an instruction that tells the jury that they are the sole and exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. This court has also many times approved an instruction which tells the jury that in weighing the testimony they may take into consideration the witness' demeanor on the stand, his knowledge of facts about which he testifies, his manner of testifying, his bias or prejudice, his willingness or unwillingness to testify; and when they have an opportunity to observe all this, then for this court to say they acted "arbitrarily" is ignoring the law and usurping the province of the jury.

How does this court know that they arbitrarily rejected his testimony? How can this court say, by merely reading the record, that the witness told the truth, when the jury found that he did not tell the truth?

"From the moment that a witness is called to the stand until he leaves it and is lost to view, his physical and mental characteristics are subject to the analysis of

twelve students of human nature, having different degrees of capacity, and more or less experience, who pass judgment upon him as well as his story." *Gorman* v. *Hand Brewing Co.,* 28 R. I. 180, 66 Atl. 209.

"The tongue of the witness is not the only organ for conveying testimony to the jury; but yet it is only the words of a witness that can be transmitted to the reviewing court, while the story that is told by the manner, by the tone and by the eye of the witness must be lost to all but those to whom it is told." *Carter* v. *Bennett,* 4 Fla. 283; Moore on Facts, Vol. 2, pages 1422, 1423.

" 'It can scarcely be repeated too often,' said the Illinois Supreme Court, 'that the judge and jury who try a case in the court below have vastly superior advantages for the ascertainment of truth and the detection of falsehood over this court sitting as a court of review. All we can do is to follow with the eye the cold words of the witness as transcribed upon the record, knowing at the same time, from actual experience, that more or less of what the witness actually did say is always lost in the process of transcribing. But the main difficulty does not lie there. There is an inherent impossibility of determining with any degree of accuracy what credit is justly due to a witness from merely reading the words spoken by him, even if there were no doubt as to the identity of the words. However artful a corrupt witness may be, there is generally, under the pressure of a skillful cross-examination, something in his manner or bearing on the stand that betrays him, and thereby destroys the force of his testimony. Many of the real tests of truth by which the artful witness is exposed, in the very nature of things cannot be transcribed upon the record, and hence they can never be considered by this court'." Vol. 2, Moore on Facts, p. 1419 *et seq.*

The only possible basis for the opinion of the majority is that they hold that Keltner told the truth, and we have no right to invade the province of the jury. If all witnesses told the truth, it would be different; but besides our own observation, we have good authority that some witnesses do not tell the truth.

"A faithful witness will not lie: but a false witness will utter lies." Proverbs 14:5.

But the majority, in the opinion, says that Keltner told the truth, although they never saw him, never heard him testify, and know nothing of his demeanor on the stand.

"If a false witness rise up against any man to testify against him that which is wrong; then both the men, between whom the controversy is, shall stand before the Lord, before the priests and the judges, which shall be in those days; and the judges shall make diligent inquisition:". Deuteronomy 19: 16, 17, 18.

Why did the law require both men, between whom the controversy is, to stand before the Lord, before the priests, and the judges? Evidently so that they could judge of their credibility and the weight of their testimony, just as we require witnesses to testify in the presence of the trial judge and jury; and when they hear them they know whether or not they told the truth.

Why does the law authorize the jury to pass on the credibility of the witnesses and the weight of their testimony, if this court can then read the record and say that a witness, whom the trial judge and jury thought told a falsehood, told the truth?

We have no right to thus invade the province of the jury, and in my opinion we violate the law when we do so. I think the judgment in this case should be affirmed. Mr. Justice HUMPHREYS agrees with me in the declarations here announced.