OLGA S. BARNES, GOAH S. BARNES, JR., and JANE BARNES, HELEN BARNES, NINA BARNES and JAMES BARNES, Minors, by OLGA S. BARNES as Their Natural Guardian, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—92 S. W. (2d) 164.

Division One, March 10, 1936.

*J. W. Jamison* and *Ward & Reeves* for appellant.

*James V. Conran* and *Cecil Shane* for respondents.

HAYS, J.—After dark, about eight-thirty, in the evening of August 28, 1931, Goah S. Barnes came to his immediate death in a collision that occurred between an automobile which he was driving and a passenger train operated by defendant railway company on a public crossing at the north edge of Gillmore, a town of some 150 inhabitants in Crittendon County, Arkansas. His surviving widow and minor children brought this action in the Circuit Court of New' Madrid County, Missouri, for damages by reason of his death. The plaintiffs recovered a judgment for $10,000 and the defendant appealed. As the case must turn on the evidence, a rather full statement of the facts and surroundings of the casualty seems appropriate.

The railroad runs approximately north and south and is straight from the crossing in question to Deckerville, a town some three miles north. The highway, No. 63, which traverses the crossing in question, is paved with concrete slab and runs parallel with and on the west side of the railroad for an indefinite distance beyond Deckerville. At a point 405 feet from said crossing the highway makes a rather sharp curve to the left for about 100 feet, then proceeds on a diminishing curve and throughout from the beginning of the curve on a gradual incline of eight to ten feet up to the level of the railroad track, which it strikes somewhat diagonally as appears from photographs in the record. There were no obstructions to a traveler's view of the train at any point within 300 feet of the crossing, although his view was to the left and rear.

Near the crossing there was a sign lettered "Stop, Arkansas Law," located on one edge of the highway, and on the other the usual cross-arm sign, both of them noticeable in the light of an advancing automobile for a distance of 100 feet. The stop-law sign was erected by the State Highway Commission of Arkansas under statutory authority.

The train, not scheduled to stop at Gillmore, operated daily between Kansas City and Pensacola, on time schedule which, including stops, made the average running time forty to forty-five—maximum fifty miles an hour. On the evening in question this southbound train on arriving at Deckerville "took the siding" and waited ten minutes for defendant's northbound Florida-Kansas City train to pass. When the latter had passed, the southbound re-entered upon the main track and proceeded—then five minutes behind schedule—to Gillmore, traveling at an accelerating speed, and attaining its maximum, estimated at forty-five to fifty miles an hour, at the crossing. The locomotive headlight illuminated the track some 800 feet ahead.

Two of plaintiffs' witnesses, Tice and Curtis, who were traveling south on said highway in an open Ford car, testified that the train passed them a quarter of a mile from the crossing. They did not see the collision as they were back one or two train lengths. Each

testified that when they were half way between Deckerville and Gillmore and traveling at forty to forty-five miles an hour a sedan (Barnes') passed their car.

Plaintiffs' witness Green, driving a truck en route to Memphis, was considerably ahead of Tice and Curtis. He had noticed the waiting train as he passed through Deckerville, and just as he left there he saw the northbound train come in. When he reached the curve referred to above he reduced his speed to fifteen or twenty miles an hour, he said. When he reached a point on the curve 310 feet from the crossing the Barnes car passed him, running at about thirty miles an hour, and continued apparently without any change of speed until it was struck by the train on the crossing, the witness's truck then being fifty feet behind the Barnes car. He said that at the time the Barnes car passed him the witness looked out the open window of his truck and over his shoulder and saw the approaching train and the light thereof. His estimate of the speed his truck traveled at in going from Deckerville until it stopped was an average of forty to forty-five miles an hour—"it was in that neighborhood."

The train engineer testified that he observed no traffic on the highway until he saw the Barnes car approaching toward the crossing, when the car was about eighty feet from the track and the locomotive ninety feet from the crossing. The engineer said he sounded emergency blasts of the whistle, and applied his emergency brakes when the automobile, approaching at fifteen miles an hour (his estimate), got up to about fifteen feet of the track, and he stopped the train as quickly as he could; and Barnes neither increased nor decreased his speed any from the time he first saw him. Every witness, except Green, within a distance of a few hundred feet of the crossing heard the noise made by the train as it approached. There was other substantial evidence tending to show the whistle blasts were not sounded—a matter for determination by the jury.

The front of the locomotive struck the automobile amidships and carried it until the train was stopped, the engine then being some 640 feet from and the train clear of the crossing. There was evidence that the Barnes car could have been stopped in five or six feet if running at fifteen miles an hour and at ten or fifteen feet if at thirty miles an hour. (Note: All testimony relative to the giving of crossing signals is omitted because of the limited scope of appellate review as dependent upon the appellant's assignment of error.)

The action was founded upon the general liability statute concerning railroads (Crawford & Moses' Digest of the Statutes of Arkansas, sec. 8562) and the statute pertaining to death by wrongful act (Id., Sec. 1074). In plaintiffs' petition the defendant was charged with negligence (1) in failing to give the statutory crossing signal (Id., Sec. 8568a); (2) in failing to obey what is commonly called the "look

out'' or ''last chance'' statute (Id., Sec. 8568); and (3) in violating the defendant's common-law duty (common law adopted, Sec. 1432), in operating the train and causing said injury, at the time and place stated, at an unusual, rapid and dangerous rate of speed over the crossing as located in the edge of the town and as much used by the public. The plaintiffs also pleaded the comparative negligence statute (Sec. 8575) in response to the defendant's answer by general denial and affirmative pleas (1) of contributory negligence and, in connection therewith, (2) Barnes' violation of Section 6 of Act No. 223 of the Laws of Arkansas, 1927, authorizing the State Highway Commission to designate and mark by stop sign particularly dangerous grade crossings of railways by highways, and Section 54, Act No. 65 of the Laws of 1929, authorizing the commission to make traffic rules and regulations concerning state highways.

The case was submitted to the jury solely upon the issue of defendant's negligence in failing to give the statutory crossing signals, and upon the statutory rule for determining, under the evidence, the degree of the deceased Barnes' contributory negligence as compared to defendant's negligence. For the purpose of this appeal it is admitted by the parties, both that the deceased was guilty of contributory negligence and that defendant was guilty of negligence in failing to give the crossing signal.

The sole error assigned is that the court below erred in refusing to give at the request of the defendant its instruction in the nature of a demurrer to the evidence, offered at the close of the whole case. The instruction declared that as a matter of law under the evidence the deceased Barnes' negligence was equal to or greater in degree than the negligence of the defendant's employees, and that plaintiffs were not entitled to recover.

In the consideration of the case this court will, under our State's established rule of comity, applicable in instances such as this, take judicial notice of all pleaded statutes of Arkansas pertinent to the cause, as well as of the decisions of the Supreme Court of that State construing such statutes. [R. S. of Mo. 1929, sec. 806; Kirkdoffer v. Railway Co., 327 Mo. 166, 37 S. W. (2d) 569.] ''In administering the substantive laws of a sister State we administer them (the *lex loci*), not our own; and we should not administer them either more or less blandly than do our sister's courts.'' [Newlin v. Railroad, 222 Mo. l. c. 392, 121 S. W. 125.]

The parties seem to agree that the rule which should govern our consideration of the case is, in effect, this: Each case must be considered upon its own peculiar facts, and the legal sufficiency of the evidence on the question of the degree of negligence must be tested, the same as in other cases, by the state of the evidence presented in a given case. It is ordinarily a question of fact for the determination of

the jury; but there may, as in other cases, be presented a question for the decision of the court as to the legal sufficiency of the evidence, and if the court, after considering the same, be of the opinion there is no reasonable view of the evidence which would support the finding that the negligence of the deceased contributing to his injury was of a less degree than that of the railroad company, the court should so decide as a matter of law. [St. Louis-San Francisco Ry. Co. v. Horn, 168 Ark. 191, 269 S. W. 576; Frisco Ry. Co. v. McClinton, 9 S. W. (2d) l. c. 1061.]

As foreshadowed the defendant's position is that ''while the deceased traveled more than 300 feet he did not look, or if he did look he could not have helped but see the train, and if he saw and continued in an effort to beat it across the track then he was not exercising any care, but was merely taking a chance, which convicts him of being negligent at least in an equal degree with that of the operators of the train; and that the deceased was guilty of additional negligence in that he violated or disregarded the Arkansas stop law.'' This stop law, it should be noted here, provides that when any railroad crossing has been designated by the highway commission as being particularly dangerous and has been sign-posted, ''it shall be unlawful for the driver of any vehicle to fail to stop within fifty feet, but not less than ten feet, from such railway tracks before traversing such crossing.'' Violation of this requirement is made a misdemeanor by Acts of 1929, section 54. The Arkansas court seems not as yet to have construed this statute. For reversal of the judgment the defendant cites the McClinton case, supra; Jemell v. St. L. S. W. Ry. Co., 11 S. W. (2d) 449; Bradley v. Mo. Pac. Railroad Co., 288 Fed. 484; Allnut v. Mo. Pac. Railroad Co., 8 Fed. (2d) l. c. 606; Grey v. Mo. Pac. Railroad Co., 23 Fed. (2d) 190; Kirkdoffer case, supra; Oxford v. Railway Co., 331 Mo. l. c. 67, 52 S. W. (2d) l. c. 988. It is unnecessary to review each one of the foreign cases cited above. They were before our court in the last two cases cited above. It will suffice in this connection, we think, to consider briefly the Jemell case, supra, as sufficiently exemplifying the application of the above rule by the Supreme Court of Arkansas in the manner here invoked by the defendant.

The traveler in that case had driven his automobile up near the track and stopped it in order to let a freight train pass which was running a short distance ahead of a passenger train, the latter being the one that shortly after struck the plaintiff. Immediately after the freight train had passed, the plaintiff started up to the track; when he reached it his engine stopped and his car rolled down the grade for a distance of some thirty-five feet; he again started up to the track and without looking for the passenger train, which was approaching at a speed of twenty miles an hour and without giving signals, and

collided with the automobile and injured him. The court held that the trainmen under the circumstances were justified in believing that he would not attempt to go upon the crossing again until the train had passed, hence their negligence was less in degree than his.

Plaintiffs' position, as we understand it, is that Barnes did not see or hear the train; that from the moment his car passed the truck the lights of the latter were shining upon him with as much illumination as that from the more elevated locomotive headlights; that if the illumination from the latter was visible to him, with the train approaching from his left and the rear, this might have caused him to confuse the lights emanating from the different sources; that the engineer in his position, with a forward view, could as readily have seen these two moving and lighted motor cars approaching the crossing as the occupants could have seen the illumination given by the train's headlights; and more readily than Barnes could have seen the train; that if the car and the truck following it were traveling only thirty-five to forty-five miles an hour and the train forty-five or fifty, it would not have caught the car at the crossing, and that the train, running behind its time schedule, must have been going in excess of forty-five or fifty miles an hour. Counsel for plaintiffs insist that the following Arkansas decisions, and a number of others which they cite, make it plain that the negligence of the deceased in the situation was less in degree than that of the trainmen irrespective of the stop statute, which they imply is of no special consequence in the situation: Mo. Pac. Railroad Co. v. Bode, 168 Ark. 157, 269 S. W. 361; St. Louis San Francisco Ry. Co. v. Haynes, 177 Ark. 104, 5 S. W. (2d) 737; C. R. I. & P. Railroad Co. v. Thomas, 184 Ark. 457, 42 S. W. (2d) 762; Mo. Pac. Railroad Co. v. Rogers, 184 Ark. 725, 43 S. W. (2d) 757; and our Kirkdoffer case, supra.

A brief analysis of the Bode case will suffice for all. Bode was crossing the railroad tracks from east to west, in the afternoon, and the train was coming from the north. His storeroom fronted the railroad in the village and his residence was a block from the railroad; he was seen by numerous witnesses and they all testified that when he crossed the side track going in the direction of the main track, he appeared to be unconscious of the approach of the train from the north, and had his head turned toward the south as if looking in that direction. The way was clear to the north and he could have seen the train if he had looked in that direction. The case went to the jury on the railroad's failure to give the statutory signals and upon the question of comparative negligence. In upholding the verdict as against a demurrer to the evidence the court, among other things, said: "The collision occurred in the light of day, and the track and right of way were clear of obstructions. Either party, deceased or the trainmen, could have discovered the danger and might

have avoided it (the collision) by the exercise of proper care. Deceased should have looked to the north, and was guilty of negligence for not doing so. On the other hand, the men operating the engine should have given the statutory signals until the crossing was passed, and if they had done so, the collision might have been averted. . . . At any rate, we are unable to say that the negligence of the deceased was, as a matter of law, equal to or greater than that of the men in charge of the engine, and we think that it was a question to be properly submitted to the jury under the circumstances of the present case.'' It appears that the court somewhat extenuated his failure to look in the one direction by his looking, seemingly intently, in the other.

The instant case on its essential facts, apart from the element of stop-law sign, is very similar to our Kirkdoffer case, supra, which may properly rule this case except in so far as is concerned the element referred to; though the facts here before us are stronger in their support of the charge, based as it is solely on failure to give the statutory crossing signal. While that case was submitted on the lookout statute, and in that respect was unsupported by the evidence as our court held, the court reversed the cause for that reason, and for the further reason of error in submitting the case both on the humanitarian doctrine, as it is formulated in the lookout statute, and on the comparative negligence statute. This court specifically held that ''the case was submissible upon the primary negligence of the defendant in failing to sound the whistle or ring the bell, as required when approaching the crossing,'' and reversed and remanded the cause.

Our attention is called to the fact that our court in the Oxford case, supra, touched upon but did not actually decide the legal effect to be given the Arkansas stop law but reserved decision thereon. Such is the fact, and it also appears that the statutory stop law was not in existence when the cause of action in that case accrued. It is to be noted in passing that the evidence tending to show the crossing signal was not given was meager and in respect to that evidence we went no farther than to say that we were inclined to think it sufficient to make plaintiff's case submissible on that issue along with another.

We deem it a fair and reasonable inference from the evidence that the deceased neither saw the stop sign (he was not shown to have been acquainted with the road) nor saw or heard the train until it came in close proximity to his car, and that his failure so to do is extenuated, under the authorities cited and by the facts already recited, to the extent of rendering his negligence in causing his injury less in degree than that of the defendant.

But the defendant contends, in effect, that the failure of deceased to stop violated the statute and this *additional* negligence, as counsel characterize it, should tip the scale the other way.

It is not a question of *greater negligence* as between the deceased and the trainmen, according to the discussion of comparative negligence by Judge THOMPSON (2 Thompson on Negligence, sec. 1608); but is, we think, a question of the degree of negligence on the part, respectively, of the deceased and the trainmen which constituted the efficient or proximate cause of the collision.

In view of what has been said, if Barnes saw the stop sign he had a right to rely to some extent upon the crossing signals being given as required by statute, just as the train operatives had a right to rely to the same extent upon his stopping as required by statute. Furthermore, it cannot be said, as a matter of law, that Barnes would not have stopped had the signals been given. They were omitted without extenuation.

From the size of the verdict and the fact that it is not complained of as being excessive we must assume the jury properly diminished the damages as directed by the trial court. The judgment is affirmed.

All concur.