MISSOURI PACIFIC RAILROAD COMPANY ET AL. *v.* WARD.

4-4996

Opinion delivered April 4, 1938.

Thomas B. Pryor and W. L. Curtis, for appellants.

Partain & Agee and Evans & Evans, for appellees.

GRIFFIN SMITH, C. J.   Richard Ward, a minor, by Mrs. A. D. Ward, his mother, as next friend, and Mrs. A. D. Ward, for herself, sued Guy A. Thompson as trustee in bankruptcy for the Missouri Pacific Railroad Company; E. O. Vickory, engineer, and Henry Bleier, fireman, claiming damages to compensate injuries resulting from a crossing accident.

It was claimed that the minor had been injured to the extent of $40,000, and that Mrs. Ward was entitled to $5,000 to cover sums already expended, and to be expended, for medical care and hospitalization. The jury found "for the plaintiff" in the sum of $17,500, and on this verdict judgment for the amount indicated was entered in favor of Richard Ward.

This suit was tried in Crawford county July 13, 1937, on a complaint filed January 20 of the same year. Allegations were that March 12, 1935, Richard Ward, then eighteen years of age, while driving a small Ford truck over appellants' Highland street railway crossing at Paragould, in Greene county, was struck and permanently injured; that he sustained bodily bruises and hurts causing loss of weight, night sweats, fever, debilitation, etc., and that such results were indices of tuberculosis which

developed in consequence of the injuries. Gravamen of the complaint was that an engine with tender attached negligently backed over the crossing; that statutory warnings were not given; that no proper lookout was kept, and that after discovering the perilous position of the Ward truck, appellants' agents continued to carelessly operate the engine in such manner as to strike the motor vehicle then being driven by young Ward.

The answer was a general and specific denial of negligence, coupled with the affirmative defense that the injuries complained of were caused entirely by the negligence of Richard Ward in driving his automobile against the locomotive tender. ''He wholly disregarded the rules of law requiring that he look, listen, and observe for the approach of a train or car before driving upon the railroad, since he could have seen said engine and tender with the string of box cars attached had he observed said rules. That he disregarded the reflection from the headlight on the tender of the approaching engine and cars, and could have heard the sound of the whistle and the ringing of the bell; and that he wholly disregarded the presence of the two brakemen who were carrying lighted lanterns.''

Evidence as to whether statutory signals were being given and a proper lookout kept, and evidence as to the conduct of Richard Ward in approaching the tracks, like evidence as to the conduct of trainmen at and subsequent to the time they could, through exercise of ordinary care, have discovered Ward's situation in time to have averted the accident, is in irreconcilable conflict.

Young Ward was driving a 1929 model ''A'' Ford ''pick-up'' truck, the property of his father with whom he was then living, but who died prior to the trial of this cause. In company with two girls the youth had attended a party at the home of Cephus Higgins. Before the affair broke up he took his brother home, then returned for the girls; and at the time the accident occurred he was on his way to an address on East Poplar street, about a mile from the scene of the evening's entertainment. ''I turned off of Pruit street half a block west of the tracks and went down the railroad. As I approached the cross-

ing I couldn't see any light, nor could I hear any whistle blowing or bell ringing, and I slowed down and looked and listened. A warehouse and gin were between me and the train on the siding along there. The warehouse is about 100 feet long. There was a street light shining down there. They were backing the engine up and didn't make any signal. I slowed down to not over fifteen miles an hour. I got almost to the track, and this car [engine and tender] came out from behind the warehouse running pretty fast. I couldn't stop or go on across the tracks. They came on and hit my truck and carried it about 110 feet. The coal tender hit me as it was backing up. I was practically on the tracks before I saw it—we were not over thirty feet apart, and I couldn't do anything.

"After stopping, the engine backed up off of two brakemen that were fastened between the truck and the engine. The truck had been jammed up against the engine. It threw me out of the truck on to the end of the engine—up there above the car under the headlights. I mean the headlight of the tender. I was thrown out through a door of the automobile. I jumped down, but was bruised and scarred all over. There was a bruised place on my hip and skinned places all over my body—about my chest here where I was hurt when I hit the tender. I got off and pulled the girls out of the truck, and they took them to the hospital. I went with them.

"The doctor patched up the girls' cut places and asked me if I was hurt, and I said I didn't think so. I didn't know if I was—I was so glad to get out without getting my neck broke.

"I went home and went to bed, but couldn't sleep that night or the next. I got nervous and had to go back to bed. From then on I lost my appetite and got to coughing. I went to Dr. Majors [in Paragould] and he kept doctoring on me, but couldn't find what was wrong. In November [1935] he sent me to Dr. Riley at the Booneville Sanatorium. I was weak and couldn't work; couldn't hold out to do much, and had night sweats. I had started a crop, but couldn't finish it; was in bed part of the time and suffered pains in my chest. Dr. Riley decided that I had tuberculosis."

Edith Bacon and Margaret Price testified that although their hearing was good and they were listening, they did not hear or see any signals or train warnings before the danger zone was reached. They were companions of Ward in the truck.

R. R. Lemons, brakeman, testified that the only signals given were "the whistle and bell as we went on the crossing."

C. B. Smith, brakeman, when asked if anything was done to give notice of the back-up movement, replied: "Not any more than when we started backing we gave the back-up signal about a block from the accident. No other alarm was given." In response to another question the witness said that the engineer gave the crossing alarm.

The fireman testified that with the equipment in use, and with the connected load, 25 feet would have been a reasonable distance within which to stop the train. Lemons, who was riding the tender, when asked whether he warned the fireman of the approaching truck, replied: "I didn't give him any warning. I didn't figure it would run into us. I had a lantern there."

Witnesses disagree as to the distance the train moved after striking the automobile. Ward testified the distance was 110 feet, while Brakeman Smith's estimate was "about thirty feet."

H. W. Wachsmuth, another brakeman, testified: "I gave the back-up signal and the whistle blew and the bell rings always in the yards. There wasn't one second the bell didn't ring during the movement of that train."

Fireman Bleier said: "The minute we left out from behind that shed I saw an automobile coming and it hit the tank. The automobile couldn't have been more than thirty feet from the track when I first saw it. The train was moving, I judge, between six and seven miles an hour. After the collision the train moved 30, 35, or 40 feet. The minute I got from behind the shed I saw this automobile. I told the engineer the automobile was going to hit, and he applied the emergency brakes and shut off steam." On cross-examination the witness was asked: "When you saw the automobile you called to the engineer—after the

accident had occurred?" The answer was, "Yes, sir." The same witness testified that the train came to a full stop within ten feet of the crossing, in compliance with rules, and then started again. "Then is when I saw the automobile—when we came out from that building."

Brakeman Smith testified that after the accident he had the engineer stop the train by calling to him.

From the evidence before us it is obvious that Richard Ward was guilty of contributory negligence in approaching the crossing without exercising due care for his own safety. However, this conduct does not bar recovery if the jury believed, from substantial testimony, that if a proper lookout had been kept by train operatives the peril of appellee could have been discovered in time to have prevented the injury by the exercise of reasonable care after such discovery. The statute provides that the burden of proof shall devolve upon the railroad to establish the fact that the duty to keep the lookout had been performed. Pope's Digest, § 11144. The rule of judicial construction is that the duty of trainmen to take precautions begins when they discover that a traveler approaching the tracks will not act in a prudent manner. *Blytheville, Leachville & Arkansas Southern Railway Company* v. *Gessell,* 158 Ark. 569, 250 S. W. 881.

In the instant case the testimony is in sharp conflict, even between employees of the railroad, as to whether signals were being sounded. If it be true that the automobile was carried 110 feet, as appellee testified, and the train might have been stopped within 25 feet, as a brakeman testified, there was a want of care. Countervailing was the testimony of witnesses for appellants that the train proceeded only about thirty feet after the accident.

Our conclusion is that there was substantial evidence to go to the jury on the question of negligence, and the verdict in that respect will not be disturbed.

The next question is: Did young Ward's injuries contribute directly to the disability diagnosed as tuberculosis?

Some members of the court, including the writer, believe that this phase of the controversy is clouded with uncertainty; and yet, we are not able to say, as a matter

of law, that tuberculosis—the eventuality which was established with certainty—was not precipitated by experiences incident to the accident.

Dr. J. D. Riley, a witness for appellee, is an acknowledged authority on tuberculosis. Since 1930 he has been superintendent of the State Tuberculosis Sanatorium at Booneville. He testified that Ward was a patient at the institution from November 21, 1935, until September 30, 1936. He said: "I believe [young Ward] had latent, inactive tuberculosis before the accident, which wasn't troubling him. But I believe the accident converted that into active tuberculosis which caused him to become disabled. I think just the experience would aggravate his tuberculosis by being nervous, and that it would soon become active tuberculosis. It would be impossible to say that he will ever be a normal person again, but he might be in the years to come. It wouldn't be safe to assume that he will be normal; there are great risks.

"He should pursue light work and avoid strain at all times, and be careful about his exercise. He was discharged as an arrested case. The reason we say 'arrested' is because the patient is not cured. But if a patient will rest and lead a normal life for, say, fifteen years, he can consider himself permanently cured. 'Arrested' doesn't mean the same thing in every case. A person may be arrested lying in bed, but tuberculosis may become active upon exercise. One person may be able to do from one to four hours' work all right, and another may become 'active' by working as short a time as thirty minutes."

On cross-examination Dr. Riley was asked this question: "Assuming, and basing your opinion on the statement, that the plaintiff, Mr. Ward, had this pathological condition in his lungs, and that he was weak and easy to take colds, as stated in your history: I will ask you if it is probable or likely that he may have developed tuberculosis in the absence of this accident?" The reply was: "Yes, sir, it is possible."

Dr. Riley, in his direct examination, had testified that Ward, when admitted to the sanatorium, gave a history of having always been weak, easy to take cold, and cough.

There was testimony by experts in behalf of appellants to the effect that the accident did not contribute to the activity found by Dr. Riley. This testimony was to the further effect that a finding that the slight injuries sustained by Ward would produce the pathological condition diagnosed in November, 1935, was wholly speculative.

Dr. Riley stated that he did not find any indication that Ward had sustained an injury to the lungs as a result of the accident.

After having been discharged from the sanatorium appellee returned to Paragould and has been engaged in part-time employment at a filling station. His duties are to service cars, sell gasoline, etc. Dr. Riley, appellee said, had directed that he rest two hours in bed each afternoon.

Although appellee testified that prior to the accident he was able-bodied and that his health was good, such testimony is in conflict with statements he made to Dr. Riley. At the time the history was given to Dr. Riley it is improbable that a lawsuit was contemplated; and Dr. Riley's diagnosis strongly corroborates the history as given by Ward.

Medical writers agree that no physician can say with certainty that a tuberculous condition in a particular patient, though treated in its incipient stage, will or will not produce permanent disability. An early diagnosis with treatment to a point where competent medical men can say, in the light of modern experiences, that an "arrest" has been effectuated, may mean that the patient will live a comparatively normal life, free from further conscious inconvenience; or, conversely, there may be a recurrence at any time. The result is problematical; and if, in the instant case, it had been shown that the appellee was not tuberculous prior to the accident, and that activity occurred because of the wreck, then it would be proper for this court to affirm the judgment.

But this is not the case. Appellee had always been weak and susceptible to colds; and coughed. These are symptoms of tuberculosis. Potentiality of the condition is emphasized by Dr. Riley's expression of belief that

dormant tuberculosis had existed over a long period of time. It might have become active, regardless of the accident. We are, therefore, confronted with possibilities and probabilities, conclusions and opinions, theories and counter theories, as applied to an inexact science. From this confusion of doubts and beliefs, in conjunction with known facts, could a jury be expected to arrive at any determination without violating principles of abstract justice—justice either to appellee or to the appellants?

Some members of the court are doubtful that the evidence justifies more than nominal damages. Another view is that there is substantial evidence to sustain a verdict for disability covering the period of ten months appellee remained in the sanatorium, and for a reasonable period thereafter; this, upon the theory that appellee, at the time of the accident, had inactive tuberculosis, and that when discharged his case was arrested. There are others who feel that the judgment should be affirmed in full.

A majority, however, have agreed that a remittitur of $7,500 should be entered. If, therefore, such remittitur is filed with the clerk of this court within fifteen days, the judgment will be affirmed. Otherwise, it will be reversed and the cause remanded for a new trial.

HUMPHREYS and MEHAFFY, JJ., dissent as to the modification