Missouri Pacific Railroad Company *v.* Campbell,
Administrator.

4-6007                                        143 S. W. 2d 9

Opinion delivered June 17, 1940.

*Henry Donham* and *E. W. Moorhead,* for appellant.

*R. W. Launius, L. A. Hardin* and *L. B. Smead,* for
appellee.

Griffin Smith, C. J.   The appeal is from a judg-
ment for $25,000 on a verdict finding that appellant rail-
road company violated the lookout statute. Pope's Di-
gest, § 11144. In consequence of this alleged negligence,
appellee's intestate was killed.

Prior to the tragedy F. O. Campbell had been a loco-
motive fireman, engaged for many years by the Rock
Island system. For three years or more he had been
laid off; but, as his wife testified, was occasionally called
to make runs, "and had retained his seniority."

Campbell was killed February 26, 1938, presumably
by freight train No. 160, operating between McGehee and

Little Rock. For three years preceding the accident Campbell had lived in Pine Bluff, having been employed by Independent Ice Company. There is testimony that he did not work the afternoon of the day he was killed, but made the statement he intended to go to Little Rock to visit relatives, and expected to catch a freight train. However, there is the testimony of R. E. McClung that he drove from Pine Bluff to Little Rock, saw Campbell on the highway, and gave him a "lift." Campbell, McClung said, got out of the automobile at the Biddle Shops near the "edge" of Little Rock. McClung says he left Pine Bluff about six o'clock p. m.

Freight Train No. 160 reached Little Rock about 9:30. Campbell's body was found wedged between main-line and spur-track rails about twenty or thirty minutes after the train had passed over the Ninth street crossing in Little Rock. The dead man's skull was crushed from the back, and the body was mangled and dismembered. There were indications that it had been dragged in both directions by passing cars or a locomotive.

There were 33 cars in the train. In East Little Rock there were switching operations. Five cars were diverted to a sidetrack near the point where Campbell's body was found. In this operation the cars were separated at a point south of the switchtrack. Twenty-two cars were left on the main line. Eleven cars were pulled north far enough to clear the switch. As explained in appellee's brief, "The switch was thrown and the engine and eleven cars backed through the switch, and five cars were cut off and left on the switchtrack, and the remaining six cars and engine pulled back onto the main line. The engine and six cars backed up and were coupled to the 22 cars which had been left on the main line south of the switch, and then the train went on into North Little Rock."

The track is straight for a considerable distance in the direction from which the train came.

H. A. Brothers, night watchman for Southern Cotton Oil Company, testified he was approximately 100 feet

from the tracks; that he noticed the freight train as it approached on the main line from the south; that it was probably 1,500 feet from him when he first saw it, and that while standing on the office porch he saw a man walking north on the railroad. The point from which this observation was made was 200 feet from where Campbell's body was found, or perhaps a little farther. The last time witness saw Campbell, he had probably had time to walk 100 feet. Witness went back to his place of business. At that time Campbell was still walking the track, and the train was approaching. He did not know the walker, and could not identify him except by the clothing. Because of similarity in dress, however, witness identified the body subsequently found as that of the person he saw on the tracks. At another place in his testimony, Brothers said that when he last saw Campbell, he was "a couple, or three hundred feet back" [south of where the body was found]. The train was then four or five blocks away; the headlight was shining brightly, and Campbell was in the light's glare. He estimated that the train was moving at "twenty or twenty-five miles an hour—they usually run that fast along there." This statement was qualified with the explanation that he "didn't pay much attention to it—I could not judge the speed of the train much from where I was standing."

There was grease on Campbell's body. Testimony was to the effect that the kind of grease so found was similar to that used on engines; that grease does not escape from car journals. It is urged that because of the nature of the grease an inference arose that it was from the engine.

The case was tried by the defendant upon the theory that Campbell boarded the train at Pine Bluff, and was killed in attempting to leave it while the switching operations were being conducted. This theory was offset by the testimony of McClung, who says he brought Campbell to Little Rock in his automobile, arriving at Biddle Station about 7:15. Appellant directs attention to Mc-Clung's explanation that he came to Little Rock to pur-

chase automobile appurtenances; that he did not inform his wife of his intention to make the trip; that he left Pine Bluff over a route not ordinarily used "because it was a hobby"; that he read in the newspapers that Campbell had been killed, but did not mention to Campbell's family for two or three weeks that he had brought him to Little Rock.

The engineer and fireman testified that they were at their posts keeping a constant lookout, and did not see anyone walking the tracks. The head brakeman also testified he rode the engine a part of the time, and did not observe a pedestrian.

Train operatives say they were over the tracks conducting the switching operations, and did not observe the dead man. It is argued, therefore, that even if McClung's story is true, Campbell, in some manner, reached the switchyard; that he must have undertaken to board the train (if he were not already on it) in order to ride to North Little Rock where his mother and father resided, and fell.

The engineer made a superficial inspection of the engine when he finished his run, but did not look underneath it. The final inspection, it was pointed out, is made by an employee whose duty it is to attend to such details. Appellee thinks it is significant that this employee was not called as a witness.

Appellee relies upon *St. Louis, I. M. & S. Ry. Co.* v. *Gibson,* 107 Ark. 431, 155 S. W. 510; *St. Louis-San Francisco Ry. Co.* v. *Crick,* 182 Ark. 312, 32 S. W. 2d 815; *Chicago, R. I. & P. Ry. Co.* v. *Cook,* 187 Ark. 914, 63 S. W. 2d 341; *Missouri Pacific Railroad Co.* v. *Grady,* 188 Ark. 302, 65 S. W. 2d 539; *Hines* v. *Johnson,* 145 Ark. 592, 224 S. W. 989; and other cases of similar import.

The Crick Case, the Grady Case, and the Gibson Case were discussed in *St. Louis-San Francisco Ry.* v. *Pace,* 193 Ark. 484, 101 S. W. 2d 447.

The testimony of Brothers placed Campbell in proximity to the scene of the accident at a time when the

train was several blocks away—approximately 1,500 feet, it was said. Campbell was then walking the track, but the witness did not know whether he was between the rails, or on the end of the ties. The engineer says he slowed down, and stopped to execute switching orders. Brothers, after going about his own business, does not know what Campbell did as the train approached. There is no suggestion that Campbell's hearing was impaired, or that he was not in possession of his normal faculties. He had been railroading for many years, and if his purpose was to wait until the train slackened its speed· sufficiently, and then to board it, there was nothing inconsistent in his act in walking on the track while the train was fifteen hundred feet away. Certainly no one knew Campbell's position better than he, and at the time Brothers says he saw him, Campbell was not in peril. Beyond this point the realm of speculation must be invaded to determine what occurred. There was no duty upon the part of the train operatives, when 1,500 feet away, even if they had seen Campbell, to assume that ne would not step aside, if in fact he were walking on the track. Of course the rule would be otherwise if the train was near enough to be dangerous.

As was said in *Porter* v. *Scullen, et al., Receivers,* 129 Ark. 77, 195 S. W. 17, "It is purely a matter of conjecture as to when or how Porter came in contact with the moving train. We cannot discover from the evidence whether he was struck by the engine or some other part of the train."

That is true in the instant case. There is no evidence indicating how Campbell was struck, or what position he was in at the time. *Missouri Pacific Railroad Co.* v. *Ross,* 194 Ark. 877, 109 S. W. 2d 1246; *Missouri Pacific Railroad Co.* v. *Penny, ante,* p. 69, 137 S. W. 2d 934.

For the error in failing to direct a verdict for the defendant, the judgment is reversed. The cause, having been fully developed, is dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.