BROWN LEE THROWER, an infant by his next friend ANNIE MAY LOCKHART, v. BERRYMAN HENWOOD, Trustee, ST. LOUIS SOUTH-WESTERN RAILWAY COMPANY, a Corporation, Appellant.—No. 37817.—173 S. W. (2d) 861.

Division Two, July 6, 1943.

Rehearing Denied, September 7, 1943.

*Oliver J. Miller* and *Lashly, Lashly, Miller & Clifford* for appellant.

664

*Max M. Librach* and *Chelsea O. Inman* for respondent.

ELLISON, J.—The respondent, a negro youth between 19 and 20 years old, and about 6 feet tall, recovered a judgment for $11,000 in the circuit court of the city of St. Louis against the appellant trustee of the St. Louis Southwestern Railway, sometimes called "The Cotton Belt," for personal injuries sustained when one of appellant's freight trains ran over him as it started moving while he was attempting to climb between the cars at a street crossing in Pine Bluff, Arkansas. The action was based on the so-called "Lookout" statute of Arkansas, Sec. 11144, Pope's Digest, 1937, and also pleaded a custom for "members of the public to climb over, between and under" the cars of trains standing at the place where the casualty occurred. Appellant's assignments of error here charge:

(1) that the trial court erred in submitting the case to the jury; (2) that the Lookout statute did [863] not apply to the facts in evidence; (3) that respondent's negligence was so gross and wanton as to constitute the intervening sole cause of respondent's injuries and preclude a recovery by him; (4) and that conduct so violative of common prudence could not be sanctioned by custom.

Respondent was on his way to school, going northerly along Mulberry street. The Cotton Belt tracks run east and west and on a curve which is concave southerly, and intersect Mulberry street. Some distance further west they cross the Missouri Pacific tracks. The Cotton Belt freight train was headed west and had stopped briefly for that railroad crossing as the Arkansas law requires. Both sides agree this resulted in the train's blocking the Mulberry street crossing. But how much of its length extended each way from the crossing can only be estimated from the evidence. There were 37 cars in the train, of the average length of 40 feet. The length of the engine and tender were not shown. The engineer testified the distance westward between the Mulberry street crossing and the Missouri Pacific crossing is 22 car lengths, which would be 880 feet. He further said he stopped the train 200 feet east of the latter. This would place the front of the engine 680 feet west of the Mulberry street crossing. Assuming the length of the engine and tender to be 100 feet (2½ car lengths), the remaining 580 feet would have been occupied by freight cars, meaning 14½ cars of the 37 car train had crossed over the Mulberry street crossing and were west of it, and the remaining 22½ cars still were east of it. In other words, a little less than half of the whole train (counting the engine and tender) was west of the crossing and little more than half east of it.

As he neared the Cotton Belt crossing respondent saw the train approaching. When he got there it had stopped, blocking the crossing. He did not know how long it would stay. Two of the train crew estimated the time was less than 1½ minutes. The statutory limit is 10 minutes. A witness for respondent said the usual time is between three and five minutes, depending on the *length* of the train, meaning it takes that long to *clear* the crossing. All agreed the stop ordinarily would be brief unless some cross bound Missouri Pacific train interfered, which did not occur in this instance. In other words the delay was not undue.

At any rate, respondent said that while he was there on the south side of the train a man climbed between the cars from the north and passed him. Prompted by this respondent attempted to do the same thing. He was over a half hour late to school and evidently in a hurry. He testified that he pulled himself up the ladder on the side of one of the same two cars, it being a box car, and stepped over on the coupler between it and the next car behind, which also was a box car as he recalled, but was not sure. Two other eyewitnesses said

this car-was a tank car. Respondent took a further step on the cross board or brake rod of the latter car preparatory to jumping to the ground on the other side when the train gave a jerk, which took the slack out of the couplers, and started forward throwing respondent under the wheels. His left leg was cut off below the knee and he sustained other injuries. Near the close of his cross-examination respondent said "When I got on, the train was stopped and I thought I would try to get through before it started up, but I didn't succeed in getting through. I had never done this before. I guess I just done it on impulse when I saw that other fellow come through."

Respondent testified that after the train had started, following his injury, it did not stop until the caboose had passed the place of the accident, which would mean it had traveled more than half its length. The engineer said he had gone 10 car lengths before he received a signal to stop. The failure to stop immediately *after* the casualty was not a proximate cause thereof, but had evidential value tending to show the train crew were not keeping a lookout for persons who might try to climb through it, or at least did not or could not see the respondent. But he further contends it was the train crew's duty to see him and stop the train *before* he was hurt.

Further on that point respondent testified that before he mounted the train he could see someone hanging out of the caboose window facing his way (though he could not see the man's eyes) and he could see the engine plainly. The engineer could not see the respondent climb on the train because he was on the right or opposite side of the engine. Neither could he see back to Mulberry street on his own side because the curve in the track was convex on that side. The fireman was on the left side of the engine whence respondent got on the train. The curvature of the track did not interfere [864] with his view, but he and the engineer both testified there was a stack of mine props or piling and some building construction inside the curve which cut off the fireman's view from the engine back to where the respondent was. They both stated further, however, that head brakeman Lowry was with them in the engine cab; and that it was Lowry's job to watch to the rear while they watched forward. But Lowry was not at the trial and no testimony from him was introduced.

The conductor was the only man in the caboose. He was up in the cupola looking ahead. He did not say from which side, but declared he didn't see respondent get on the train; and that he could not see the ground clear along the track, especially because of the curve. Lites and Tidwell, the two rear brakemen were on the back platform of the caboose protecting the rear of the train. Tidwell did not testify, but respondent introduced his deposition. Neither he nor Lites, who was on the left side of the platform (the inside of the curve), looked forward along the sides of the train or saw the respondent until after the accident. But Lites declared it was not

the rear brakemen's duty to get down on the ground where they could see forward, because of the briefness of the stop. When the caboose passed respondent after the casualty and the brakemen saw him lying on the ground the air brakes were set and the train stopped.

There was an air valve on the rear platform of the caboose near brakeman Lites and another in the cupola. Respondent's expert witness, Martin, and appellant's engineer, King, agreed operation of either of these air valves or the one in the engine would reduce the air pressure throughout the whole train of 37 cars simultaneously, thereby setting the brakes. The engineer said it would do this immediately. The expert said "almost at once." Respondent's witness Chaney said Mulberry street was "heavily traveled;" that traffic was "pretty heavy." Appellant's conductor, Barnes, said if the train was delayed at the crossing they would cut the train "and let the autos and people through." One witness said there was a school three blocks away, and that when the Mulberry crossing was blocked by a train the school children would stand and wait until it had passed, some of the bigger ones crossing through the train.

Several of appellant's train crew said they knew of no *custom* for people at the Mulberry street crossing to climb or crawl through a standing train, though it sometimes occurred at Pine Bluff and other stations on the railroad. Several witnesses for respondent declared they had seen persons climb over or through trains at that crossing. One witness estimated he had seen it done "many times"; another said "10 or 12 times or probably more"; another, "sometimes". Still another witness said people had done that for 25 years, but not frequently. Respondent did not testify to any such custom or say he relied on one. Several of the train crew declared the engine whistled twice before it started to move, and that the bell was ringing automatically. The respondent testified he didn't hear them.

There is no contention that the starting of the train was unduly violent. Two carpenters working on an adjacent grocery warehouse testified for appellant that the other man (referred to by respondent) who had climbed between the cars, boarded the train after it had whistled and started forward; and that respondent and this man passed each other on the cars while they were moving and some 60 to 100 feet before they had reached the crossing. Another of appellant's eyewitnesses said he saw respondent get on the train after it had begun to move, but was impeached by proof of a prior contradictory oral statement. Respondent denied all this. All three of these witnesses stated respondent fell before the cars had got to Mulberry street. In fact the two carpenters and brakeman Lites said that after respondent had been run over he lay on the ground a little east of that street.

The first question to be determined is whether the Arkansas Lookout statute applies to the instant facts, where the respondent

was in the public street by the side of a motionless train, and on impulse attempted to climb between the cars to the other side. The statute is as follows (italics ours):

"It shall be the duty of all persons running trains in the State upon any railroad to keep a constant lookout for persons . . . *upon the track* . . ., and if any person . . . shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad shall be liable and responsible to the person injured for all damages resulting [865] from neglect to keep such lookout, notwithstanding *the contributory negligence* of the person injured, where, if such lookout had been kept, the . . . employees in charge of such train . . . could have discovered *the peril* of the person injured *in time* to have prevented the injury by the exercise of reasonable care *after the discovery of such peril,* and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed."

Respondent pleaded this statute in his petition. By force of Sec. 958, R. S. 1939, Mo. R. S. A., sec. 958, we are therefore required to take judicial notice not only of the statute but of the judicial decisions of Arkansas construing it, which latter in effect become a part of the statute. Ramey v. Mo. Pac. Ry. Co., 323 Mo. 662, 675(2), 21 S. W. (2d) 873, 877(5b). Under a number of these decisions the lookout to be kept is not restricted literally to persons *on* the track, as the statute says, but includes persons near or approaching the track.[1] This duty further extends to trains which are not in motion,[2] such as cars being loaded or unloaded or stored on a sidetrack. And it has been held in three cases that if the engineer for some reason, as because of a curve in the track or some obstruction, cannot keep an efficient lookout then some other member of the train crew must do so if possible.[3] But the statute expressly imposes that duty only on train *operatives,* "persons running trains." It does not require either

[1] Mo. Pac. Rd. Co. v. Doyle, 203 Ark. 1111, 160 S. W. (2d) 856, 858(5); Mo. Pac. Rd. Co. v. Eubanks, 200 Ark. 484, 139 S. W. (2d) 413, 414(3); Mo. Pac. Rd. Co. v. Ward, 195 Ark. 966, 971, 115 S. W. (2d) 835, 837(4); Baldwin v. Brim, 192 Ark. 252, 255, 91 S. W. (2d) 255, 257; Mo. Pac. Rd. Co. v. Greene, 177 Ark. 217, 6 S. W. (2d) 26, 28(2); B., L. & A. S. Ry. Co. v. Gessell, 158 Ark. 569, 581, 250 Ark. 881, 882(2); Bush v. Brewer, 136 Ark. 246, 256, 206 S. W. 322, 325(3).

[2] St. L. S. W. Ry. Co. v. Brummett, 201 Ark. 53, 143 S. W. (2d) 555, 557(2); St. L.-S. F. Ry. Co. v. Sheppard, 194 Ark. 619, 109 S. W. (2d) 109, 110(3); DeQ. & E. Rd. Co. v. Pigue, 135 Ark. 499, 205 S. W. 888; L. R. & H. S. W. Rd. Co. v. McQueeney, 78 Ark. 22, 92 S. W. 1120.

[3] Mo. Pac. Rd. Co. v. Manion, 196 Ark. 981, 120 S. W. (2d) 715, 719; Mo. Pac. Rd. Co. v. Nelson, 195 Ark. 883, 115 S. W. (2d) 872, 875; Kelly v. DeQ. & E. R. Co., 174 Ark. 1000, 298 S. W. 347(2). But see St. L.-S. F. Ry. Co. v. Williams, 180 Ark. 413, 21 S. W. (2d) 611, 612(2). Probably in this case it was impossible for the fireman to keep a better lookout than the engineer.

an unnecessary duplication of operative lookouts or watchmen along the right of way who are not operatives of the train.[4]

There is also this further important element in the Lookout statute. It forgives the contributory negligence of the injured party and on the other hand requires the train operatives to keep a lookout *only* for the protection of persons in *peril*, where the peril could be discovered in time to avert the injury by the exercise of reasonable care thereafter. It is a discoverable peril rule practically equivalent to our own humanitarian doctrine, and has been so denominated by three of our decisions,[5] though the Arkansas statute is somewhat broader because it covers trespassers and property, whereas our doctrine is sometimes more restrictive, Mayfield v. K. C. So. Ry. Co., 337 Mo. 79, 91, 85 S. W. (2d) 116, 123(12). Also the statute and Arkansas decisions speak only of the "peril" of the injured party while we call it "imminent peril." But the reasoning of the decisions in the two states shows the same thing is meant. The rule enforced under the statute is that the operatives of a train have the right to assume a traveler or pedestrian approaching a railroad track or crossing will act in a prudent manner, and their duty to take precautions begins only when it becomes apparent that he will not do so.[6]

Referring to several recent decisions. In Mo. Pac. Rd. Co. v. Merrell, 200 Ark. 1061, 143 S. W. (2d) 51, 54(6), a case based on the Lookout statute, the plaintiff was walking alongside the track near a depot. The opinion ruled: "There was no duty on them (the train crew) to stop or even slow down the train for one in a place of safety or for one in a place of danger, who knew of the danger and had ample time to get away"—unless it could be done after actual or possible discovery of the party's peril (meaning, as we understand, after he had gone into a place of danger or failed to withdraw therefrom). In Mo. Pac. Rd. Co. v. King, 200 Ark. 1056, 143 S. W. (2d) 55, 57, the plaintiff was walking toward the track in a town. The cause was submitted on the Arkansas comparative negligence statute, not the Lookout statute, but the opinion followed and cited the Merrell case, supra, holding: "there was no testimony to support a finding that (plaintiff's) peril could have been discovered in time to have avoided striking him, had a proper lookout been kept." Other

---

[4]St. L. S. W. Ry. Co. v. Mitchell, 115 Ark. 339, 171 S. W. 895; Oxford v. St. L.-S. F. Ry. Co., 331 Mo. 53, 66(5), 52 S. W. (2d) 983, 988(6); McGlothin v. Thompson, 347 Mo. 708, 720, 148 S. W. (2d) 558, 565.

[5]Kirkdoffer v. St. L.-S. F. Ry. Co., 327 Mo. 166, 174, 177, 37 S. W. (2d) 569, 572, 573(5); Oxford v. St. L.-S. F. Ry. Co., supra, 331 Mo. 1. c. 68, 52 S. W. (2d) 1. c. 989(9); Barnes v. St. L.-S. F. Ry. Co., 338 Mo. 497, 505, 92 S. W. (2d) 164, 168.

[6]Mo. Pac. Ry. Co. v. Doyle, 203 Ark. 1111, 160 S. W. (2d) 856, 858(5); Crossett Lbr. Co. v. Cater, 201 Ark. 432, 144 S. W. (2d) 1074; Mo. Pac. Rd. Co. v. Ward, 195 Ark. 966, 115 S. W. (2d) 835, 837(4); B. L. & A. So. Ry. Co. v. Gessell, 158 Ark. 569, 572, 250 S. W. 881, 882.

late cases of similar import are: Mo. Pac. Rd. Co. v. Campbell, 200 Ark. 1056, 143 S. W. (2d) 9, 11; and Crossett Lbr. Co. v. Cater, supra, 201 Ark. 432, 144 S. W. (2d) 1. c. 1076.

The rule to be deduced from these decisions, and others such as Mo. Pac. Rd. Co. v. Severe, 202 Ark. 277, 150 S. W. (2d) 42, 44(1), and Baldwin v. Brim, 192 Ark. 252, 91 S. W. (2d) 255, 256(1), seems to be as follows. The mere fact of injury (or death) does not make a prima facie case for the plaintiff. He must produce substantial evidence: (1) that the injuries were sustained from the operation of a train, by one "upon the track;" (2) that the injured party was in peril; (3) and that his danger was discoverable so the injury might have been thereafter averted through a proper lookout, if one had been kept by the train operatives. When that showing has been made, the burden shifts to the defendant railroad to show by preponderating evidence either that the required lookout would have been unavailing, or that it was kept and the injures resulted notwithstanding from the party's own sole negligence.

In the instant case the train was standing over the crossing. Respondent testified he could plainly see the attached locomotive. He had no right to believe it would remain motionless a long time, for he admitted he did not know how long it would be there and that he thought he would try to get through before it started. And his own witness said the usual time required to *clear* the crossing was three to five minutes depending on the length of the train. He was either walking toward or standing by the train, and admitted he mounted it on impulse when he saw a man climb through from the other side. The case is not comparable to those where a pedestrian or motorist is seen approaching the track with the apparent intent of recklessly crossing over ahead of a moving train. Nor even is it like those where a standing car is moved striking a person in its range who could not be expected to anticipate the movement.

Respondent did not rely on any so-called "custom" of climbing through such trains. His brief merely *defends* the introduction of that testimony, saying "there was no error" in admitting it because it was competent to show the *train crew's* knowledge of the probable danger. But we know of no decision either in this state or Arkansas holding train operatives must assume persons will thus jeopardize their own lives, when there is nothing in their conduct at the time to indicate it, merely because people thoughtlessly or recklessly have done that repeatedly. The rule in Arkansas is directly to the contrary, as shown by the Merrell, King, Campbell and Cater cases reviewed or referred to in the third preceding paragraph. Respondent had his safety in his own hands, as he walked toward or stood by the train, and was not in *peril*. For that reason the train crew then owed him no duty under the Lookout statute.

Did the statute protect him after he had mounted the train? In other words, was he then a person ''upon the track'' for whom a ''lookout'' must be kept? There is no Arkansas decision on the question. In comparable legal situations there is a difference in the status of a person before and after he gets on a train. Thus one standing on the highway at a railroad crossing is not a trespasser,[7] But when he boards the train without right or permission, or attempts to climb through, he becomes a [867] trespasser.[8] Similarly, one intending to take passage on a train who has not purchased a ticket and presented himself at the proper place does not become a passenger until he enters or attempts to enter the train.[9] The Dillahunty case just cited held the Lookout statute does not cover even passengers boarding trains. The Mitchell case heretofore cited in marginal note 4 excludes from its application the operators of railroad motorized hand cars because they are not trains. And C., O. & G. Ry. Co. v. Doughty, 77 Ark. 1, 10(8) ruled the statute does not protect railroad employees operating trains but applies only to third persons. Logically we are unable to see why a similar distinction should not be drawn under the Lookout statute between persons on, near or approaching the track and those who have got on the train, especially in view of its express terms requiring a ''lookout'' for persons ''upon the track,'' which on its face implies persons external to the train.

But while having reached the conclusion that the statute does not cover persons on trains, we are unwilling to let our decision rest on it alone, in the absence of Arkansas decisions more in point than any we have found. There is, however, another question decisive of the case on which there is authority from that state. It will be remembered one of the facts the plaintiff must prove, is that his danger was discoverable by a proper lookout in time to have averted the casualty. The train in this case contained 37 cars and was over a quarter of a mile long, exclusive of the engine and tender. It was nearly 900 feet from the caboose to the Mulberry street crossing and about 580 feet from there to the tender. There were 37 couplings between the cars to be watched if the train crew were required to keep a constant lookout on all of them. The engineer and fireman had to watch ahead toward the Missouri Pacific crossing. Someone had to protect the rear of the train.

The conductor was in the cupola of the caboose looking forward, but he could not see down to the ground at the side of the cars. He testified he did not see the respondent, and the testimony as a whole

---

[7]52 C. J., sec. 2108, p. 539; 44 Am. Jur., sec. 494, p. 733; St. L.-S, F. Ry. Co. v. Hill, 197 Ark. 63, 121 S. W. (2d) 869, 872(10)

[8]52 C. J., sec. 2121, p. 549; 44 Am. Jur., sec. 504, p. 743; Cato v. St. L. S. W. Ry. Co., 190 Ark. 231, 79 S. W. (2d) 62.

[9]10 C. J., sec. 1041, p. 615; 10 Am. Jur., sec. 966, p. 34; Dillahunty v. C., R. I. & P. Ry. Co., 119 Ark. 392, 178 S. W. 420, 422(5); Murphy v. St. L., I. M. & S. Ry. Co., 43 Mo. App. 342.

bears that out because the train did not stop after it had started, until the caboose had run past Mulberry street and respondent was seen lying on the ground. On the convex side of the curve nobody could see the whole length of the train. There were some obstructions to view on the other side. The head brakeman, who was up in the engine cab and did not testify, was supposed to look back but obviously he could not see to the ground on both sides of the train. People at the much traveled Mulberry street crossing might be standing in safety one instant, and the next have a sudden impulse to get on or through the train as respondent did. Any such person would be discoverable only during the brief few seconds when he was mounting or going under the cars. Afterward he would be hidden from view. In such circumstances could a practicable lookout be kept?

There are several Arkansas cases which answer that question in the negative. In Kelly v. DeQ. & E. Rd. Co., supra, 174 Ark. 1000, 298 S. W. 347, where a train was switched against two box cars which killed the deceased on the track, his movements at the time of the casualty were not seen. There was a brakeman on top of the train but the decision said it was impossible for him to see the deceased because of the intervening two cars. And a directed verdict for defendant was affirmed on the ground that it was entirely conjectural whether an efficient lookout could have been kept. In St. L.-S. F. Ry. Co. v. Sheppard, supra, 194 Ark. 619, 109 S. W. (2d) 110, where the deceased was crawling under two cars which were struck by three others, there was no operative on the latter cars. But the court ruled it was a matter of conjecture only whether an employee keeping a lookout on top of the approaching cars could have seen the deceased between the track and the mill three feet away from which he came and got under the cars.

In St. L.-S. F. Ry. Co. v. McClinton, 178 Ark. 73, 9 S. W. (2d) 1060, where plaintiff climbed between two cars to which "several others" and an engine were attached, all standing on a curved track, there was undisputed testimony that no train operative saw plaintiff's act, although [868] a lookout was being kept by switchman on top of the moving cars (we understand this to refer to the "several others"). The opinion held: "No practical lookout which a train crew could maintain would suffice to prevent one from climbing between cars." In Cato v. St. L. S. W. Ry. Co., 190 Ark. 231, 79 S. W. (2d) 62, the deceased attempted to pass under or between the standing cars of a branch line train which had just pulled into Stuttgart, blocking two streets and a much used path. None of the train crew saw him. A recovery was denied in all these cases. It is true they were brought under the comparative negligence statute and not under the Lookout statute. But a later decision, Baldwin v. Brim, supra, 192 Ark. 252, 91 S. W. (2d) l. c. 257(5), which was

674

based on the Lookout statute, in speaking of the McClinton and Cato cases, declared "they arose under facts where no lookout, however efficient, could have discovered the perilous position of the parties injured."

These decisions indicate the character and practicality of the lookout which must be kept in such instances. As was stated in Barnes v. St. L.-S. F. Ry. Co., supra, 338 Mo. l. c. 502(1), 92 S. W. (2d) l. c. 166(1): "In administering the substantive laws of a sister state we administer them (the lex loci) not our own; and we should not administer them either more or less blandly than do our sister's courts." In the light of the Arkansas decisions we are constrained to hold the judgment should be reversed. It is so ordered. All concur.